**Katuria E. SMITH; Angela Rock; Michael Pyle; for themselves and all others similarly situated, Plaintiffs–Appellants,**

v.

**UNIVERSITY OF WASHINGTON, LAW SCHOOL; Wallace D. Loh; Sandra Madrid; Richard Kummert; Michael Townsend; Roland Hjorth, Defendants–Appellees,**

and

**Robert Aronson; John Junker; Jacqueline McMurtrie; Eric Schnapper; Janet Stearns, Defendants.**

Katuria E. Smith; Angela Rock; Michael Pyle, Plaintiffs–Appellants,

v.

The University of Washington Law School, Defendant–Appellee.

Katuria E. Smith; Angela Rock; Michael Pyle, Plaintiffs–Appellants,

v.

The University of Washington Law School; Wallace D. Loh; Roland Hjorth; Sandra Madrid; Richard Kummert, Defendants–Appellees.

Nos. 99–35209, 99–35347 and 99–35348.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 14, 2000.

Filed Dec. 4, 2000.

Michael E. Rosman, Center for Individual Rights, Washington, DC, for the plaintiffs-appellants.

David J. Burman, Perkins Coie, LLP, Seattle, Washington, for the defendants-appellees.

Martin Michaelson, Hogan & Hartson, L.L.P., Washington, DC, for American Council on Education, et al.

Michael C. Small, Mark D. Rosenbaum, Daniel P. Tokaji, ACLU Foundation of Southern California, Los Angeles, California, W. Ward Morrison, Jr., Graham & James LLP; Riddell Williams P.S., Seattle, Washington, on behalf of the American Civil Liberties Union of Washington, and Steven R. Shapiro, ACLU Foundation, New York, New York, for Tyson Marsh, et al.

Walter E. Dellinger, O'Melveny & Myers, LLP, Washington, DC, for amicus curiae the Law School Admission Council.

Timothy J. Moran, Department of Justice, Washington, DC, for amicus curiae the United States of America.

Before: REAVLEY,[1] FERNANDEZ, and THOMAS, Circuit Judges.

FERNANDEZ, Circuit Judge:

Katuria Smith, Angela Rock, and Michael Pyle (collectively Smith) brought this action on behalf of themselves and a class of Caucasians and others who were denied admission to the University of Washington Law School. The action was brought against the law school and members of its administration and faculty[2] (collectively the Law School), and in it Smith claimed that the denials of admission had been due to racially discriminatory admissions policies, which violated 42 U.S.C. §§ 1981, 1983, and 2000d. The district court decertified a class which had previously been certified under Federal Rule of Civil Procedure 23(b)(2), and did not certify a class under Federal Rule of Civil Procedure 23(b)(3).[3] The district court also denied Smith a partial summary judgment on the claim that, in general, race cannot be used as a factor in achieving educational diversity, although it may be used for certain limited remedial purposes. Smith appealed, and we affirm.

## BACKGROUND

On July 1, 1997, Smith filed suit against the Law School alleging illegal discrimination against Caucasians and others on the basis of their race, which resulted in their being denied admission to the law school. From at least 1994 to December of 1998, the Law School did use race as a criterion in its admissions process so that it could assure the enrollment of a diverse student body. There is no dispute about that. Katuria Smith was denied admission in 1994, but she attended another law school and obtained her law degree there. Angela Rock was denied admission in 1995. She, too, attended another law school and obtained her law degree. Michael Pyle

---

1. The Honorable Thomas M. Reavley, Senior Circuit Judge for the Fifth Circuit, sitting by designation.

2. The individuals are Wallace D. Loh, Dean of the Law School (1990–1995), Roland J. Hjorth, Dean of the Law School (1995–), Sandra Madrid, Assistant Dean of the Law School, and Richard Kummert, Faculty Member and Chair of the Admissions Committee of the Law School.

3. Hereafter we will simply refer to Federal Rule of Civil Procedure 23 as Rule 23.

was denied admission in 1996, but when he reapplied in 1999 he was admitted. By that time, the overt racial policy had been terminated.

On April 22, 1998, the district court certified a Rule 23(b)(2) class for injunctive and declaratory relief only.[4] The court did not certify a class with respect to damages at that time.[5] The case proceeded, but so did time and events in the world outside of the courtroom. On November 3, 1998, the people of the State of Washington passed Initiative Measure 200, which enacted the following provision among others: "[t]he state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." [6]

The Law School then moved to dismiss the individual and class actions, on the basis that the claims were moot as the result of the passage of I–200 because it prohibits the Law School from discriminating in the manner that Smith complained of. Smith opposed the motion to dismiss and argued that the claims were not moot because of the uncertainty of how the Law School would actually interpret and apply I–200, but the Law School pointed out that, pursuant to a directive from the president of the University of Washington, it had eliminated the use of race as a criterion in its admission process. The new admission policy did retain a diversity clause, which stated that "[i]mportant academic objectives are furthered by ... students ... from diverse background[s]" and then went on to set out a nonexhaustive list of factors as indicative of diversity including "persevering or personal adversity or other social hardships; having lived in a foreign country or spoken a language other

than English at home; career goals ...; employment history; educational background ...; evidence of and potential for leadership ...; special talents ...; geographic diversity or unique life experiences." Race itself, along with color and national origin, were excluded from the list. On February 10, 1999, the district court issued an order granting the motion to dismiss the individual and class claims for injunctive and declaratory relief as moot due to the passage of I–200, and decertifying the Rule 23(b)(2) class.

On February 12, 1999, the district court issued another order in which it denied Smith's motion for partial summary judgment. However, on February 22, 1999, it also made the necessary findings under 28 U.S.C. § 1292(b) and went on to designate "two controlling question[s] of law as to which there is substantial ground for difference of opinion: (1) whether educational diversity is a compelling governmental interest that meets the requirement of 'strict scrutiny' for race-conscious measures under the Fourteenth Amendment to the United States Constitution; and (2) whether race may be considered only for remedial purposes." Smith then sought to appeal both the order of February 10, 1999, and the order of February 12, 1999. We granted the applications.

## JURISDICTION AND STANDARDS OF REVIEW

Pursuant to Rule 23(f) and our order which granted permission to appeal, we have jurisdiction over Smith's appeal from the order decertifying the Rule 23(b)(2) class. Pursuant to 28 U.S.C. § 1292(b) and our order which granted permission to appeal, we have jurisdiction over Smith's

---

4. The certified class consisted of all Caucasian applicants who were denied admission to the law school commencing in 1994.

5. The district court entered an order on February 22, 1999, clarifying its April 22, 1998, order "to hold that for the reasons stated in that Order certification of the plaintiffs'

claims for damages would not be appropriate under Rule 23(b)(3)."

6. The measure is now codified at Wash. Rev. Code § 49.60.400(1). It will hereafter be referred to as I–200.

appeal from the order denying partial summary judgment.

■■■ "We review a district court's determination of mootness de novo." *Knight v. Kenai Peninsula Borough Sch. Dist.,* 131 F.3d 807, 811 (9th Cir.1997). However, we review a district court's determination regarding class certification, including denial of certification, for an abuse of discretion. *See id.* at 816; *Barber v. Hawaii,* 42 F.3d 1185, 1197 (9th Cir.1994); *Montgomery v. Rumsfeld,* 572 F.2d 250, 255 (9th Cir.1978). In order for a party to be entitled to summary judgment, he must show not only that there are no questions of material fact, but also that he is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Western Chance No. 2, Inc. v. KFC Corp.,* 957 F.2d 1538, 1540 (9th Cir.1992). Those are matters that we review de novo. *See Western Chance,* 957 F.2d at 1540.

### DISCUSSION

Smith asks us to reverse the district court on three bases. First, the district court's determination that the Rule 23(b)(2) class for prospective relief should be decertified is attacked. Similarly, Smith attacks the district court's failure to certify a Rule 23(b)(3) damages class action. Finally, Smith asserts that the district court improperly failed to grant a partial summary judgment because it should have determined that the Law School was prohibited from using a race-conscious admissions policy under the circumstances. We will discuss the first and the last of these issues on the merits, but reject the second because it is not properly before us.

### A. *Class Certification; Mootness*

■■ Smith first attacks the district court's determination that once I–200 was passed and its force was recognized by the Law School, there was no reason to rule on the claims for declaratory and injunctive relief. We agree with the district court. That is, regardless of what the Law School might have thought that the United States Constitution allowed, after initiative measure I–200 was passed state law directed that "in the operation of ... public education" the state was prohibited from discriminating or offering preferential treatment to "any individual or group on the basis of race, sex, color, ethnicity, or national origin." That, as the district court indicated, made it unnecessary to enjoin the Law School from operating a preferential program, and made it equally unnecessary to declare that it could not do so. Moreover, there was no need to continue with a class action for that purpose. In a word, that part of the controversy had become moot.

■■■ Mootness is, of course, simply one facet of justiciability. *See Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968). Mootness is like standing, in that if it turns out that resolution of the issue presented cannot really affect the plaintiff's rights, there is, generally speaking, no case or controversy for the courts to adjudicate; no real relief can be awarded. As has sometimes been said: "Mootness is 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Native Vill. of Noatak v. Blatchford,* 38 F.3d 1505, 1509 (9th Cir. 1994) (citation omitted). In this case, the district court did find standing in the first place, but, again, it properly determined that it could give no relief of a prospective nature once the statute and its aftermath had accomplished all that a judgment could accomplish. As sometimes happens, time and events, including the movement of societal opinion, outstripped the court processes.

That is the short answer, but that alone will not do because this is an area rife with exceptions, qualifications, even quibbles. So we must go on. It is true, as Smith

points out, that the Supreme Court has opined that when a party asserts that a case has become moot, "[t]he burden of demonstrating mootness 'is a heavy one.'" *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). That does not mean that the burden cannot be borne, and it was in the just quoted case. *See id.*

It is fair to say, nonetheless, that courts are particularly cautious when a case has become moot because the defendant has voluntarily ceased to pursue the challenged course of action. Were it otherwise, the defendant's "[m]ere voluntary cessation" would compel the courts to "leave '[t]he defendant ... free to return to his old ways.'" *United States v. Concentrated Phosphate Exp. Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968) (citation omitted). Of course, that would be intolerable. But even when a cessation is voluntary, mootness can follow. Even then, the record may show that "(1) it can be said with assurance that 'there is no reasonable expectation ....' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis,* 440 U.S. at 631, 99 S.Ct. at 1383 (citations omitted); *see also Norman–Bloodsaw v. Lawrence Berkeley Lab.,* 135 F.3d 1260, 1274 (9th Cir.1998).

We, too, have recognized that the voluntariness of the cessation is a factor, rather than a clincher. As we explained in *Armster v. United States Dist. Ct.,* 806 F.2d 1347, 1358 n. 16 (9th Cir.1987), "it appears that the voluntariness of the cessation is relevant to the issue of the likelihood of recurrence." And in a case where Congress had changed the statutory scheme, we reflected on the fact that "[o]rdinarily, voluntary cessation of challenged activity will not render a claim moot." *Martinez v. Wilson,* 32 F.3d 1415, 1420 (9th Cir.1994). Yet, we said, there was "'no reasonable expectation' that the challenged practices—if invalid—will be reinstated." *Id.*

(citation omitted). Thus, we found that the plaintiff's injunction request was moot. *Id.* Finally, in *White v. Lee,* 227 F.3d 1214, 1243 (9th Cir.2000), we upheld the district court's denial of declaratory and injunctive relief because it was clear that the agency's voluntary change in position was "a permanent change" in the way it did business and was not "a temporary policy that the agency will refute once this litigation has concluded." Thus, we said, the claim for prospective relief was moot. *Id.* at 1244.

We are satisfied that when these approaches are applied to this case, even if the Law School's change of policy has some tinge of voluntary cessation, as Smith contends, the matter is still moot. The only truly voluntary aspect is that the Law School did stop using race, ethnicity, and national origin as factors once I–200 was passed and the directive from the president of the University was issued. The Law School did not wait for litigation or internal University discipline before doing that. To the extent that can be called voluntary, it is still highly unlikely that the Law School's old practices will be recrudescent under the current state of the law in Washington.

Moreover, considering the real reason for the change, it is rather apparent that it was made under the lash of I–200 and not because of the prodding effect of this litigation. That tends to indicate that the change was not really voluntary at all. *See Sze v. INS,* 153 F.3d 1005, 1008 (9th Cir.1998); *Pub. Utils. Comm'n v. Fed. Energy Regulatory Comm'n,* 100 F.3d 1451, 1460 (9th Cir.1996); *Noatak,* 38 F.3d at 1511; *see also Texas v. Hopwood,* 518 U.S. 1033, 1034, 116 S.Ct. 2581, 2582, 135 L.Ed.2d 1095 (1996) (Ginsburg, J., joined by Souter, J.) (certiorari properly denied because old race-based program was discontinued and would not be reinstated). In fact, it is generally fair to say that when a change of position is wrought by a statutory provision, the change is neither volun-

tary nor likely to be resiled from at any time in the foreseeable future.

■ As we declared in *Noatak*, 38 F.3d at 1510, "[a] statutory change ... is usually enough to render a case moot, even if the legislature possesses the power to re-enact the statute after the lawsuit is dismissed. As a general rule, if a challenged law is repealed or expires, the case becomes moot." Smith argues that *Noatak* can be distinguished because it involved the repeal of a statute that was being challenged. Smith is correct, but that is a distinction without a difference. As other courts have said, the real point is that a new statutory enactment has removed the basis or need for relief. *See Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 990 (9th Cir.2000); *Defenders of Wildlife, Inc. v. Endangered Species Scientific Auth.*, 725 F.2d 726, 732 (D.C.Cir.1984); *New Mexico ex rel. New Mexico State Highway Dep't. v. Goldschmidt*, 629 F.2d 665, 667–68 (10th Cir.1980). That is what has occurred here.

There can be no real expectation that the alleged wrongs will recur now that the people of the state have prohibited them. Nor can we address Smith's fear of "the *possibility* that the state's allegedly discriminatory policy will manifest itself under the new statute. Federal courts are not authorized to address such theoretical possibilities." *Noatak*, 38 F.3d at 1510. And, surely, this is not the kind of wrong that is so limited in duration that it would always escape review. *Id.* If the Law School should become temerarious enough to decide to ignore the law of the State of Washington in the future, Smith, or others, can commence a new battle at that time.

But, says Smith, the Law School insisted, and still insists, that its race-conscious selection program was perfectly legal before the people of the State of Washington declared otherwise. Assuming that is so, it does not suggest that the Law School is ready to violate state law. It has not done so as far as this record shows, and we will not assume that it will. Similarly, we will

not assume that it will act in bad faith. *See Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 318–19, 98 S.Ct. 2733, 2763, 57 L.Ed.2d 750 (1978); *cf. United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 856–57 (9th Cir.1995) (where defendant had violated regulations and introduced reforms under protest, its "past illegal conduct [gave] rise to an inference that future violations may occur"); *Gluth v. Kangas*, 951 F.2d 1504, 1507 (9th Cir.1991) (past arbitrary actions and vague new policies suggest reoccurrence). Rather, the fact, if it is a fact, that the Law School bridles at the harness placed upon it by the people of the state may go to show that its actions are not voluntary, but it does not go to show that the Law School will break that harness.

■ In short, the request for prospective relief is moot. In so stating, we have not overlooked Smith's assertion that declaratory relief is sometimes proper, even when injunctive relief is not. We recognize that in principle. *See Steffel v. Thompson*, 415 U.S. 452, 468–69, 94 S.Ct. 1209, 1220–21, 39 L.Ed.2d 505 (1974); *Zwickler v. Koota*, 389 U.S. 241, 254, 88 S.Ct. 391, 399, 19 L.Ed.2d 444 (1967); *Olagues v. Russoniello*, 770 F.2d 791, 803 (9th Cir.1985). That, however, does not serve to resurrect the claim in question here. Declaratory relief claims are not immune from mootness considerations. *See Kasza v. Browner*, 133 F.3d 1159, 1172 (9th Cir. 1998); *Enrico's Inc. v. Rice*, 730 F.2d 1250, 1254–55 (9th Cir.1984). And here there is no more reason to maintain a prospective declaratory relief class action to pass on the now abandoned policy than there is to issue an injunction against that policy. The one claim is as moot as the other.

Thus, the district court properly decertified the Rule 23(b)(2) class action, which had been certified in the first place for declaratory and injunctive relief only. That, then, leads to Smith's claim that there should have been a damages class action also. *See* Rule 23(b)(3).

B. *Class Certification; Damages*

The district court did not certify a damages class action under Rule 23(b)(3) at the time that it first certified the injunctive and declaratory relief class action on April 22, 1998. At that time, Smith did not have a right to seek an immediate appeal in this court because the special appeal procedure was not yet effective. *See* Rule 23(f) (effective December 1, 1998). No other certification of issues for appeal was then requested or obtained. In that respect, it should be noted that Smith had not actually asked for both a Rule 23(b)(2) and a Rule 23(b)(3) class certification, but had, instead, listed the latter as an alternative to the former. In this circuit, at least, the provisions are not mutually exclusive. *See Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 622 (9th Cir.1982); *see also Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir.1999). *Contra DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1175 (8th Cir.1995).

At any rate, when the district court decertified the Rule 23(b)(2) class on February 10, 1999, the new procedure was in place and an immediate appeal could be, and was, applied for. However, the Rule 23(b)(3) issue was not part of the order of February 10, 1999, and is not properly before us at this time. Nor will it do to argue, as Smith does, that we can consider the whole of the district court's order, and reverse for any appropriate reason. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1365 (11th Cir.1997); *Bernard v. Air Line Pilots Ass'n Int'l*, 873 F.2d 213, 215 (9th Cir.1989). When we consider the whole of the order in question, we still find no references to any possible Rule 23(b)(3) certification,[7] and that is not surprising because the issue was not then placed before the district court. The closest the district court came to even addressing damages was its reflection that the old Rule 23(b)(2) class action could not continue on the theory that some incidental damages might be appropriate. Not only had the district court refused to include damages in the initial certification, but also damages would hardly be incidental when the prospective relief portion of the action had become moot. *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 411–18 (5th Cir.1998); *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir.1986).

Therefore, the district court's order which refused to certify a Rule 23(b)(3) class is not properly before us, and we will not consider it.

C. *Denial of Partial Summary Judgment*

The district court denied Smith's partial summary judgment motion because it decided that under Supreme Court precedent race could be used as a factor in educational admissions decisions, even where that was not done for remedial purposes. That, in effect, encompasses the questions that the district court thought warranted a 28 U.S.C. § 1292(b) order, and the questions that we accepted for decision.

There can be no doubt that the district court's decision faithfully followed Justice Powell's opinion in *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In that opinion, Justice Powell, while announcing the opinion of the Court, held that the race-based quota system used by the Medical School at the University of California at Davis violated both Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d—2000d-4, and the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 269–72, 98 S.Ct. at 2737–38. In arriving at that con-

---

7. We recognize that on February 22, 1999, the district court clarified its April 22, 1998, order by indicating that although it had not expressly addressed the alternative motion to certify a Rule 23(b)(3) class in the earlier order it did not believe that damage claims would be an appropriate part of a class action in this case. But no appeal was sought from the February 22, 1999, order.

clusion, Justice Powell laid down certain principles.

■ *First*,[8] strict scrutiny will be applied to "a classification based on race and ethnic background." *Id.* at 289, 98 S.Ct. at 2747. Simply put, that is because "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *Id.* at 291, 98 S.Ct. at 2748. Thus, when the state chooses to use race in its decision making process, an affected individual "is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest." *Id.* at 299, 98 S.Ct. at 2753.

■ *Second*, if the purpose of an educational institution "is to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected not as insubstantial but as facially invalid." *Id.* at 307, 98 S.Ct. at 2757. Pure (or, if you will, impure) percentages used for their own sake are not proper.

■ *Third*, "[t]he State certainly has a legitimate and substantial interest in ameliorating, or eliminating where feasible, the disabling effects of identified discrimination." *Id.* However, that will not justify a racial classification "in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations." *Id.* And, "isolated segments of our vast governmental structures are not competent to make those decisions, at least in the absence of legislative mandates and legislatively determined criteria." *Id.* at 309, 98 S.Ct. at 2758. As a result, when the purpose of the classification is simply to help "certain groups ... perceived as victims of 'societal discrimination' [that] does not justify a classification that imposes disadvantages upon persons ..., who

bear no responsibility for whatever harm the beneficiaries of the special admissions program are thought to have suffered." *Id.* at 310, 98 S.Ct. at 2758.

■ *Fourth*, the attainment of a diverse student body "is a constitutionally permissible goal for an institution of higher education." *Id.* at 311–12, 98 S.Ct. at 2759. In that regard, "ethnic diversity" can be "one element in a range of factors a university properly may consider in attaining the goal of a heterogenous student body." *Id.* at 314, 98 S.Ct. at 2760–61. In an admissions program dedicated to achieving a mixed student body a university may, therefore, deem race or ethnic background to be "a 'plus' in a particular applicant's file, [when] it does not insulate the individual from comparison with all other candidates for the available seats." *Id.* at 317, 98 S.Ct. at 2762. In other words, race can be a factor in determining a particular candidate's "potential contribution to diversity without the factor of race being decisive" when compared to the qualities exhibited by others. *Id.* So, for example, a list of factors could include, in addition to race, such qualities as "exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, a history of overcoming disadvantage, [or] ability to communicate with the poor." *Id.* So, when all is said and done, even if race is a consideration, each applicant is, in fact, treated as an individual rather than as a mere stand-in for some favorite group. *See id.* at 318, 98 S.Ct. at 2762. The effect, then, is that each person's qualifications will have been weighed fairly, and a losing candidate will not have a basis "to complain of unequal treatment under the Fourteenth Amendment," because, even if the last available seat has been given to a person who received "a 'plus' on the basis of ethnic background," the loser "will not have been foreclosed from all consideration

---

8. We will hereafter refer to these and the other principles we outline as the First principle, the Second principle, etc.

for that seat simply because he was not the right color or had the wrong surname." *Id.*

The Law School does not assert that its program came within the Third principle, but it does say that it came within the Fourth one. The district court agreed that if the Law School did come within the Fourth principle, Smith was not entitled to a partial summary judgment. That, as we have said, is a correct reading of Justice Powell's opinion. The difficulty with which we are presented is that in *Bakke* none of the other Justices fully agreed with Justice Powell's opinion, so we are left with the task of deciding just what the Supreme Court decided.

In a separate opinion, Justice Stevens, who was joined by Chief Justice Burger and Justices Stewart and Rehnquist, agreed only that the program under review violated Title VI when it excluded "Bakke from the Medical School because of his race." *Id.* at 421, 98 S.Ct. at 2815. Thus, there was no need to address the broader constitutional issues. Whatever the Constitution might demand, they said, Title VI "has independent force, with language and emphasis in addition to that found in the Constitution," and it prohibited the program in question. *Id.* at 416, 98 S.Ct. at 2812. As a result, the Fourth principle could not save the program from violating Title VI and the Third principle would not do so either.

Justice Brennan authored still another opinion in which he was joined by Justices White, Marshall and Blackmun. They would have upheld the program in question, quota system though it was. In their view, Title VI "does not bar the preferential treatment of racial minorities as a means of remedying past societal discrimination to the extent that such action is consistent with the Fourteenth Amendment." *Id.* at 328, 98 S.Ct. at 2768. That, then, brought them to considering what the Fourteenth Amendment required.

In the first place, they expressed discomfort with the idea that strict scrutiny of this kind of racial classification (that is, one that advantages others over Caucasians) should be required when the classification did not tend to stigmatize a less favored group. *See id.* at 356–58, 98 S.Ct. at 2781–82. Still, they recognized that the "'mere recitation of a benign, compensatory purpose'" should not be enough where race is concerned. *Id.* at 358–59, 98 S.Ct. at 2782–83 (citation omitted). In their view, "to justify such a classification an important and articulated purpose for its use must be shown," and as a result "review under the Fourteenth Amendment should be strict—not 'strict' in theory and fatal in fact, because it is stigma that causes fatality—but strict and searching nonetheless." *Id.* at 361–62, 98 S.Ct. at 2784 (internal quotations omitted). Thus, they would seemingly apply somewhat less strict scrutiny, although it is clear that Justice Powell did not mean strict in theory while fatal in fact when he articulated the First principle.

Justice Brennan, and the others, however, did not agree with Justice Powell's limitation of the Third principle to those instances where institutional discrimination was shown, or legislative, etc., findings were made. Rather, they would permit a program whose "articulated purpose [was] remedying the effects of past societal discrimination." *Id.* at 362, 98 S.Ct. at 2784. In other words, they would allow individual institutions, and programs, like the Davis Medical School to give "preferential treatment for those likely disadvantaged by societal racial discrimination." *Id.* at 366, 98 S.Ct. at 2787. They, therefore, approved of "race-conscious programs" for the purpose of remedying the "disparate racial impact" that an admissions policy might otherwise have "if there is reason to believe that the disparate impact is itself the product of past discrimination, whether its own or that of society at large." *Id.* at 369, 98 S.Ct. at 2788.

In fine, the Justices who concurred in Justice Brennan's opinion would have es-

tablished a principle broader than the Third principle because they would have allowed individual institutions or departments to ameliorate societal discrimination, even without specific judicial, legislative or administrative findings at the proper level. That being so, they would have upheld the program in question. Thus, they would have accepted an even more expansive use of racial factors than that permitted in Justice Powell's opinion.

That leaves the Fourth principle. It is interesting to note that Justice Brennan's opinion does not really disagree with the Fourth principle's statement that race can be used as a plus factor, even if there were no past societal discrimination shown, as such. Really, his opinion did not need to do so because he saw societal discrimination as a given, and would, perhaps, allow much more than a simple plus to be assigned to it. Nevertheless, he and the Justices who joined him were of the opinion that their approach did not grant seats in the university based solely on race, but only to "minority applicants likely to have been isolated from the mainstream of American life ...; other minority applicants are eligible only through the regular admissions program." *Id.* at 377, 98 S.Ct. at 2792. And, they asserted, their approach also gave applicants "individualized consideration." *Id.* at 378 n. 63, 98 S.Ct. at 2793 n. 63. Finally, they saw no real difference between a "plus" program and one that used a kind of quota, except that the former might be "more acceptable to the public." *Id.* at 379, 98 S.Ct. at 2793.

Therefore, it appears that those Justices would simply give more weight to the race factor than would the Fourth principle, but they, it seems clear, would not have eschewed the use of a plus factor in a program that also looked to other considerations. Indeed, they saw nothing unconstitutional about a diversity based program that at least purported to take all kinds of special characteristics and talents, including race, into account, and they opined that a program of that sort is cer-

tainly constitutional. *See id.* In other words, they agreed with the Fourth principle's conclusion that a program of that type was constitutional.

But what is one to make of that fragmented decision of the Supreme Court; what guidance or principles did it convey to an anxious nation, and to even more anxious educators? Perhaps it is a sign of our fractious times that the Supreme Court has had to provide us with a template for reading its fractured opinions. It has declared that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (citation omitted); *see also Harris v. Wright*, 93 F.3d 581, 584 (9th Cir. 1996); *United States v. Puerta*, 982 F.2d 1297, 1304 (9th Cir.1992).

*Bakke* presents a special problem because Justice Brennan's opinion disagreed with Justice Powell's opinion that the Davis Medical School program, as it then stood, had to be overturned on constitutional grounds. The overturning of that program, thus, actually required the vote of Justice Powell plus the votes of those who joined in Justice Stevens' opinion. The latter, however, so voted on the broad basis that Title VI precluded all race-conscious admission policies. Thus, Justice Powell's opinion was certainly more narrow than theirs in that respect. Still, it was clear that a majority of the Court did not take the view reflected in Justice Stevens' opinion. A majority would have allowed for some race-based considerations in educational institutions, both under Title VI and under the Fourteenth Amendment. Thus, a race-based possibility must be taken to be the actual rationale adopted by the Court. Certainly, Justice Powell's opinion has often been cited approvingly in that regard. *See, e.g., Metro Broad., Inc.*

*v. FCC,* 497 U.S. 547, 568, 110 S.Ct. 2997, 3010, 111 L.Ed.2d 445 (1990), *overruled on other grounds by Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); *Johnson v. Transp. Agency,* 480 U.S. 616, 637–38, 107 S.Ct. 1442, 1455, 94 L.Ed.2d 615 (1987); *Higgins v. City of Vallejo,* 823 F.2d 351, 358 (9th Cir.1987); *see also Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 285–86, 106 S.Ct. 1842, 1853, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring). We must, therefore, apply the *Marks* analysis to the opinions of Justices Powell and Brennan.

When we do, it becomes apparent that Justice Powell's analysis is the narrowest footing upon which a race-conscious decision making process could stand. If educational institutions can sometimes use race in their admission alchemy, virtually every point in Justice Brennan's opinion would establish broader grounds for allowing that. The standard of scrutiny set forth in the First principle would become, if anything, less demanding. The Third principle would be vastly expanded to allow any unit of any institution to take account of *societal discrimination.* Finally, race would, at the very least, become a much more weighty factor in the Fourth principle, and even come close to being a trump where some disadvantage to a member of a favored group was shown. True it is that Justice Brennan did not specifically say that "race" could be used to achieve student body diversity in the absence of any societal discrimination, but, then, there was no need for him to do so in light of his view about past societal discrimination. Yet, we can hardly doubt that he would have embraced that somewhat narrower principle if need be, for he thought that it was simply an allotrope of the principle he was propounding. If the various

opinions in *Bakke* mixed so many different colors that the result became rather muddy, that result was still clear enough to permit educators to rely upon the opinion that gave the decision its life and meaning—the opinion that avoided both polar possibilities. More importantly, we are required so to do.

We are well aware of the fact that much has happened since *Bakke* was handed down. Since that time, the Court has not looked upon race-based factors with much favor. *See, e.g., Adarand,* 515 U.S. at 227, 115 S.Ct. at 2112–13; *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989). Still, it has not returned to the area of university admissions, and has not indicated that Justice Powell's approach has lost its vitality in that unique niche of our society. As we see it, regardless of what we think the Supreme Court might do, we must let it decide. It has admonished that "other courts [should not] conclude [that] our more recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997). On the contrary, it has said, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989).

We, therefore, leave it to the Supreme Court to declare that the *Bakke* rationale regarding university admissions policies has become moribund, if it has. We will not.[9] For now, therefore, it ineluctably

---

9. We acknowledge that *Hopwood v. Texas,* 78 F.3d 932 (5th Cir.1996), decided to the contrary. The flaws in that decision, however, stem from its failure to properly apply the teachings of *Marks,* 430 U.S. at 193, 97 S.Ct. at 993, and *Agostini,* 521 U.S. at 237, 117 S.Ct. at 2017. *See Lesage v. Texas,* 158 F.3d 213, 223 (5th Cir.1998) (Reavley, J. concurring), *reversed on other grounds,* 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999); *Hopwood v. Texas,* 84 F.3d 720, 723 (5th Cir.1996) (Politz, C.J., dissenting from failure to grant rehearing en banc).

follows that the Fourteenth Amendment permits University admissions programs which consider race for other than remedial purposes, and educational diversity is a compelling governmental interest that meets the demands of strict scrutiny of race-conscious measures.

## CONCLUSION

■ The district court correctly decided that Justice Powell's opinion in *Bakke* described the law and would require a determination that a properly designed and operated race-conscious admissions program at the law school of the University of Washington would not be in violation of Title VI or the Fourteenth Amendment. It was also correct when it determined that *Bakke* has not been overruled by the Supreme Court. Thus, at our level of the judicial system Justice Powell's opinion remains the law.

However, the Law School has encountered a peripeteia in its own state; it is bound by I–200, which precludes it from granting "preferential treatment" to any individual "on the basis of race." That has rendered Smith's request for prospective relief moot because we "[should] not assume that a university, professing to employ a facially nondiscriminatory admissions policy, would operate it as a cover for the functional equivalent of a quota system. In short, good faith [should] be presumed in the absence of a showing to the contrary...." *Bakke,* 438 U.S. at 318–19, 98 S.Ct. at 2763.

AFFIRMED.