Jennifer GRATZ and Patrick Hamacher, for themselves and all others similarly situated, Plaintiffs,

v.

Lee BOLLINGER, James J. Duderstadt, the Board of Regents of the University of Michigan, Defendants,

and

Ebony Patterson, Ruben Martinez, Laurent Crenshaw, Karla R. Williams, Larry Brown, Tiffany Hall, Kristen M.J. Harris, Michael Smith, Khyla Craine, Nyah Carmichael, Shanna Dubose, Ebony Davis, Nicole Brewer, Karla Harlin, Brian Harris, Katrina Gipson, Candice B.N. Reynolds, by and through their parents or guardians, Denise Patterson, Moise Martinez, Larry Crenshaw, Harry J. Williams, Patricia Swan–Brown, Karen A. McDonald, Linda A. Harris, Deanna A. Smith, Alice Brennan, Ivy

Rene Charmichael, Sarah L. Dubose, Inger Davis, Barbara Dawson, Roy D. Harlin, Wyatt G. Harris, George C. Gipson, Shawn R. Reynolds, and Citizens for Affirmative Action's Preservation, Defendant–Intervenors.

No. 97–CV–75231–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 13, 2000.

Kerry L. Morgan, Pentiuk & Couvreur, Taylor, MI, David F. Herr, Mason, Edelman, Minneapolis, MN, for Jennifer Gratz, Patrick Humacher.

Godfrey J. Dillard, Detroit, MI, for Ebondy Patterson, Ruben Martinez, Laurent Crenshaw, Karla R. Williams, Larry Brown, Tiffany Hall, Kristen M.J. Harris, Michael Smith, Khyla Craine, Nyah Carmichael, Shanna Dubose, Ebony Davis, Nicole Brewer, Karla Harlin, Brian Harris, Katrina Gipson, Candice B.N. Reynolds, Citizens for Affirmative Action's Preservation.

Philip J. Kessler, Butzel Long, Ann Arbor, MI, John A. Payton, John H. Pickering, Wilmer, Cutler, Washington, DC, Leonard M. Niehoff, Butzel, Long, Detroit, MI, Jane Sherburne, Wilmer, Cutler, Washington, DC, for Lee Bollinger, James T. Duderstadt.

Philip J. Kessler, Butzel Long, Ann Arbor, MI, Leonard M. Niehoff, Butzel, Long, Detroit, MI, for University of Michigan, Bd. of Regents, University of Michigan College of Literature, Arts and Science.

Richard A. Wilhelm, Dickinson, Wright, Bloomfield Hills, MI, for College Entrance Examination Bd.

Susan I. Leffler, Michigan Dept. of Atty. Gen., Habeas Corpus Division, Lansing, MI, for Jennifer M. Granholm.

Oscar M. Garibaldi, Keith A. Noreika, Covington, Burling, Washington, DC, Brice M. Clagett, Covington & Burling, Washington, DC, for National Ass'n of Scholars.

Kenneth Geller, Mayer, Brown, Washington, DC, for General Motors Corp.

Jeffrey S. Silver, Randall E. Mehrberg, Jenner & Block, Chicago, IL, Deanne E. Maynard, Shilpa S. Satoskar, Jenner & Block, Washington, DC, Jon D. Botsford, Dwight K. Hamilton, Steelcase Inc., Grand Rapids, MI, for Steelcase, Inc.

Jeffrey S. Silver, Jenner & Block, Chicago, IL, for Abbott Laboratories, Bank One Corp., E.I. DuPont de Nemours Co., Dow Chemical Co., Eastman Kodak Co., Eli Lilly and Co., General Mills, Inc., Intel Corp., Johnson and Johnson, Kellogg Co., KMPG Intern., Lucent Technologies, Inc., Microsoft Corp., PPG Industries, Inc., Procter and Gamble Co., Sara Lee Corp., Texaco, Inc., TRW, Inc.

Theodore M. Shaw, Olatunde C.A. Johnson, Melissa S. Woods, NAACP Legal Defense & Educ. Fund, Inc., New York, NY, Godfrey J. Dilliard, Milton R. Henry, Reginald M. Turner, Citizens for Affirmative Action's Preservation, Detroit, MI, Christopher A. Hansen, E. Vincent Warren, American Civil Liberties Union Foundation, New York, NY, Patricia Mendoza, Marta Delgado, Mexican American Legal Defense & Educ. Fund, Chicago, IL, Brent E. Simmons, ACLU Fund of Michigan, Lansing, MI, Michael J. Steinberg, ACLU Fund of Michigan, Detroit, MI, for Defendant–Intervenors.

## OPINION

DUGGAN, District Judge.

On October 14, 1997, Plaintiffs filed a class action against the University of

Michigan and various university officials asserting that the University's College of Literature, Science, and the Arts ("LSA") had violated Title VI of the Civil Rights Act, as well as the Equal Protection Clause of the Fourteenth Amendment, by considering race as a factor in admissions decisions. Plaintiffs seek injunctive, declaratory, and monetary relief.

On December 23, 1998, this Court issued an Order bifurcating the action into a "liability" and "damages" phase. This matter is currently before the Court on cross-motions for summary judgment with respect to the "liability" phase only, which has been previously defined as "whether [D]efendants' use of race as a factor in admissions decisions violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution," [1] and has been specifically limited to Plaintiffs' request for injunctive and declaratory relief.[2] Oral argument was heard on November 16, 2000.

For the reasons set forth herein:

Plaintiffs' motion for summary judgment shall be granted with respect to the LSA's admissions programs in existence from 1995 through 1998, and the admissions programs for such years shall be declared unconstitutional;

The University Defendants' motion for summary judgment shall be granted with respect to the LSA's admissions programs for 1999 and 2000;

Plaintiffs' request for injunctive relief shall be denied;

Defendants Duderstadt and Bollinger's motion for summary judgment on grounds of qualified immunity shall be granted; and

The Board of Regent's motion for summary judgment on grounds of Eleventh Amendment immunity shall be denied.[3]

## Background

The University of Michigan ("University") is a public institution of higher education located in Ann Arbor, Michigan. According to Defendants, admission to the University is selective, meaning that many more students apply each year than can be admitted. The University received some 13,500 applications for admission to the LSA in 1997, from which it elected to enroll 3,958 freshmen. Among its stated admissions objectives, the University strives to compose a class of students from diverse races, ethnicities, cultures, and socioeconomic backgrounds. The University views diversity as an integral component of its mission. According to the University, diversity "increase[s] the intellectual vitality of [its] education, scholarship, service, and communal life." (Jt. Summ. Facts at 1).[4] To facilitate the University's goal of diversity, it is undisputed that the LSA employs race as a factor in its admissions decisions.

Plaintiffs Jennifer Gratz and Patrick Hamacher are Caucasion residents of the State of Michigan, both of whom applied for admission into the 1995 and 1997 classes of the LSA, respectively. On January 19, 1995, Plaintiff Gratz was notified that a final decision regarding her admission had been delayed until early to mid

1. Because Title VI "proscribe[s] only those racial classifications that would violate the Equal Protection Clause," it is not necessary for the Court to engage in a separate analysis regarding Plaintiffs' claims under Title VI. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287, 98 S.Ct. 2733, 2746, 57 L.Ed.2d 750 (1978).

2. In the same Order, this Court certified a class consisting of:
   Those individuals who applied for and were not granted admission to the College of Literature, Science & the Arts of the University of Michigan for all academic years from 1995 forward and who are members

   of those racial or ethnic groups, including Caucasian, that defendants treated less favorably on the basis of race in considering their application for admission.
   (12/23/98 Op. at 15).

3. This Opinion and its corresponding order shall address only the University Defendants' arguments regarding diversity. The Intervenor–Defendants' arguments regarding remedial measures shall be addressed in a supplemental opinion and order.

4. The parties have provided the Court with a Joint Summary of Undisputed Facts Regarding Admissions Process, which was filed on December 13, 2000.

April 1995, as she was considered by the LSA as "well qualified, but less competitive than the students who ha[d] been admitted on first review." (*Id.*). On April 24, 1995, Plaintiff Gratz was notified that the LSA was unable to offer her admission. Thereafter, Plaintiff Gratz enrolled in the University of Michigan at Dearborn, from which she graduated in the spring of 1999.

Similarly, Plaintiff Hamacher was notified on November 19, 1996, that a decision regarding his admission was "postponed" until mid-April of 1997. According to the LSA's letter, a decision regarding Plaintiff Hamacher had been postponed because, "[a]lthough [his] academic credentials [were] in the qualified range, they [were] not at the level needed for first review admission." (*Id.* at 2). On April 8, 1997, Plaintiff Hamacher's admissions application was rejected. Thereafter, Plaintiff Hamacher enrolled at Michigan State University.

The Defendant–Intervenors are seventeen African American and Latino students who have applied for, or intend to apply for, admission to the University, joined by the Citizens for Affirmative Action's Preservation, a nonprofit organization whose stated mission is to preserve opportunities in higher education for African American and Latino students in Michigan. According to Defendant–Intervenors, the resolution of this case directly threatens African American and Latino students' access to higher education.

Plaintiffs have filed a motion for summary judgment asserting that the LSA's use of race as a factor in admissions decisions violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Equal Protection Clause of the United States Constitution. The University Defendants have filed a cross-motion for summary judgment asserting that the LSA's use of race as a factor in admissions decisions is, as a matter of law, constitutional. Defendant–Intervenors have filed responses to both motions, supporting the University Defendants' assertion that the LSA's admissions policies are constitutional.

### Standard of Review

Summary judgment is proper only if there is no genuine issue as to any material fact, thereby entitling the moving party to judgment as a matter of law. *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 709 (6th Cir.2000); *see also* FED. R. CIV. P. 56(c). There is no genuine issue of material fact for trial unless, by viewing the evidence in a light most favorable to the nonmoving party, a reasonable jury could "return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to show that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. at 2552–53. The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir.1994). The nonmoving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 339–40 (6th Cir.1993). If, after adequate time for discovery, the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his claim, summary judgment is appropriate. *Celotex*, 477 U.S. at 322–24, 106 S.Ct. at 2552–53.

### Discussion

As previously mentioned, this phase of the litigation has been explicitly limited to

the issue of "liability," defined as "whether Defendants' use of race as a factor in admissions decisions violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution," as well as Plaintiffs' request for injunctive and declaratory relief. (12/23/98 Op. at 15; 5/1/00 Op. & Order at 4). Specifically, Plaintiffs seek a declaratory judgment that the LSA's admission policies and practices for the academic years 1995 through the present violate Plaintiffs' rights under the Constitution and 42 U.S.C. §§ 1981, 1983, and 2000d. Without such a declaration, Plaintiffs' claims for monetary relief fail. Plaintiffs further seek an order permanently enjoining the LSA from engaging in illegal, racially discriminatory admissions practices in the future.

■ The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST., amend. XIV, § 1. The "central mandate" of the Fourteenth Amendment "is racial neutrality in governmental decisionmaking." *Miller v. Johnson*, 515 U.S. 900, 904, 115 S.Ct. 2475, 2482, 132 L.Ed.2d 762 (1995) (citing *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); *McLaughlin v. Florida*, 379 U.S. 184, 191–92, 85 S.Ct. 283, 287–88, 13 L.Ed.2d 222 (1964)). "The basic principle is straightforward: 'Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination.'" *Id.* (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978) (Powell, J.)). Accordingly, the Supreme Court has explicitly clarified that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are

narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995).

Two interests have been asserted in support of the LSA's race conscious admissions policies. The University Defendants assert that the LSA has a compelling interest in the educational benefits that result from having a diverse student body, whereas the Defendant–Intervenors assert that the LSA has a compelling interest in remedying the University's past and current discrimination against minorities.[5] Therefore, the two issues this Court must decide in resolving the parties' motions for summary judgment are: (1) whether Defendants have asserted a compelling governmental interest in support of the LSA's use of race and (2) whether the measures by which the LSA has used race as a factor in admissions decisions were narrowly tailored to serve such interest.

Both the Plaintiffs and the University Defendants have agreed to the material facts relating to the mechanics of the LSA's admission policies, and that the Court has, in the record currently before it, all the evidence they wish to present. Therefore, both Plaintiffs and the University Defendants agree there is no need for a trial with respect to the issue of whether diversity constitutes a compelling interest under strict scrutiny, and whether the LSA's admissions programs were narrowly tailored to achieving that interest, and that, based upon the record before the Court, such issues may be resolved by summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### The Diversity Rationale

Both parties assert that with respect to the University Defendants' "diversity" rationale, the Supreme Court's decision in *Regents of the University of California v.*

---

5. Only the Defendant–Intervenors have asserted that the LSA's admissions policies serve a remedial purpose. The University Defendants have never justified the LSA's race-conscious admissions policies on remedial grounds.

*Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), governs this dispute. In support of their motion for summary judgment, the University Defendants, supported by Defendant–Intervenors and a number of amici, contend that under Justice Powell's decision in *Bakke*, the University has a compelling governmental interest in the educational benefits that flow from a racially and ethnically diverse student body. The University Defendants also contend that under *Bakke*, the LSA's admissions policies were properly tailored to achieve the University's stated interest in diversity.

Plaintiffs, however, contend that Justice Powell's decision in *Bakke* has never garnered a majority of support from the Justices and that subsequent Supreme Court cases have confirmed that "diversity" and "academic freedom" are not compelling governmental interests that can ever justify the use of race in the admissions process. In the alternative, Plaintiffs contend that even if this Court were to find "diversity" to be a sufficiently compelling interest, they are nonetheless entitled to summary judgment because the manner in which the LSA used race in admissions decisions for the years at issue in this case, 1995 through the present, is inconsistent with that specifically endorsed by Justice Powell in *Bakke*.

### 1. The "Bakke" Decision

■ In *Bakke*, a rejected applicant challenged the University of California at Davis Medical School's admissions program, which consisted of two systems: a regular admissions system for non-minority applicants, and a special admissions system strictly for minorities. *Bakke*, 438 U.S. at 273–75, 98 S.Ct. at 2739–40. In contrast to the regular admissions system, the special minority admissions system operated with a separate committee, a majority of whom were members of minority groups. Special applicants were rated by the special committee in a manner similar to the regular admissions system, except

that the special applicants did not have to meet the 2.5 minimum GPA applied to non-minority applicants.

Under the university's special admissions system, the special applicants were never compared against the non-minority applicants. The special admissions committee would continue to recommend special applicants for admission until a specific number of minority applicants were admitted, which was predetermined by faculty vote. For example, in 1973 and 1974, sixteen out of the one hundred available seats were reserved for special applicants.

According to the university, its special admissions system served the purposes of: "(i) 'reducing the historic deficit of traditionally disfavored minorities in medical schools and in the medical profession,' (ii) countering the effects of societal discrimination, (iii) increasing the number of physicians who will practice in communities currently underserved; and (iv) obtaining the educational benefits that flow from an ethnically diverse student body." *Id.* at 306, 98 S.Ct. at 2756–57.

The Supreme Court of California sustained the applicant's challenge, holding that the university's admission program violated the California Constitution, Title VI, and the Equal Protection Clause of the Fourteenth Amendment. On appeal, the United States Supreme Court, through a majority formed by Justices Powell, Stevens, Burger, Stewart and Rehnquist, affirmed the California Supreme Court's finding that the university's special admissions system was invalid, as was its order directing the university to admit the respondent to the Medical School. The Supreme Court also, through a different majority formed by Justices Powell, Brennan, White, Marshall, and Blackmun, reversed the California Supreme Court's order enjoining the university from ever considering race in making admissions decisions. An examination of the separate opinions in *Bakke*, however, clearly illustrates that there were no clear grounds upon which a

majority of the Court agreed in reaching their respective decisions.

*Justice Powell's Opinion*

Justice Powell, writing solely for himself, supplied the pivotal vote in both affirming the California Supreme Court's finding that the university's admission program was unlawful, and reversing the California Supreme Court's order "enjoining [the university] from according any consideration to race in its admission process." *Id.* at 272, 98 S.Ct. at 2738.

Applying strict scrutiny, Justice Powell found that to the extent that the university's purpose was to "assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected, not as insubstantial, but as facially invalid." *Id.* at 307, 98 S.Ct. at 2757. Justice Powell also rejected the university's proffered interests in countering the effects of societal discrimination and improving the delivery of healthcare to disadvantaged communities. *Id.* at 307–10, 98 S.Ct. at 2757–59.

However, Justice Powell found that the university's fourth goal, "the attainment of a diverse student body," was "clearly" a "constitutionally permissible goal for an institution of higher education." *Id.* at 311–12, 98 S.Ct. at 2759. Relying upon the "four essential freedoms" that constitute "academic freedom," *i.e.* " 'to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study,' " Justice Powell concluded that "[t]he freedom of a university to make its own judgments as to education includes the selection of its student body." *Id.* at 312, 98 S.Ct. at 2759 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring)). According to Justice Powell, "[t]he atmosphere of 'speculation, experiment and creation'—so

essential to the quality of higher education—is widely believed to be promoted by a diverse student body." *Id.* at 312, 98 S.Ct. at 2760. Furthermore, "the 'nation's future depends upon leaders trained through wide exposure' to the ideas and mores of students as diverse as this Nation of many peoples." *Id.* at 313, 98 S.Ct. at 2760.

According to Justice Powell, a university's "interest in diversity is compelling in the context of a university's admissions program," in which "[e]thnic diversity ... is only one element in a range of factors a university properly may consider in attaining the goal of a heterogenous student body." *Id.* at 314, 98 S.Ct. at 2760–61.

*Justice Brennan's Opinion*

Applying intermediate scrutiny, Justice Brennan, joined by Justices White, Marshall, and Blackmun, found that the university's articulated purpose of remedying the effects of past societal discrimination was "sufficiently important to justify the use of race-conscious admissions programs where there is a sound basis for concluding that minority underrepresentation is substantial and chronic, and that the handicap of past discrimination is impeding access of minorities." [6] *Id.* at 362, 98 S.Ct. at 2784.

*Justice Stevens's Opinion*

Based upon the fact that *Bakke* was not a class action, but rather a "controversy between two specific litigants," Justice Stevens, joined by Chief Justice Burger, Justice Stewart, and Justice Rehnquist, viewed "the question of whether race can ever be used as a factor in an admissions decision" as an issue not before the Court. *Id.* at 408 & 411, 98 S.Ct. at 2808 & 2809. Justice Stevens also declined to address the issue on constitutional grounds, relying solely upon Title VI's prohibition instead, which Justice Stevens viewed as "crystal clear: Race cannot be the basis of exclud-

---

**6.** As noted *supra,* the Supreme Court has since clarified that all racial classifications are subject to strict scrutiny review. *See Ada-* *rand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

ing anyone from participation in a federally funded program." *Id.* at 418, 98 S.Ct. at 2813.

### 2. Diversity as a Matter of Law

In support of their motion for summary judgment, the University Defendants contend that under Justice Powell's reasoning in *Bakke,* the University has, as a matter of law, a compelling governmental interest in the educational benefits that flow from a racially and ethnically diverse student body.[7] According to the University Defendants, Justice Powell's opinion in *Bakke* stands as the narrowest grounds offered in support of the judgment in that case and is therefore also binding precedent on this Court.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976)). As explained by the Sixth Circuit, "[w]here a Justice or Justices concurring in the judgment in such a case articulates a legal standard which, when applied, will necessarily produce results with which a majority of the Court from that case would agree, that standard is the law of the land." *Triplett Grille, Inc. v. City of Akron,* 40 F.3d 129, 134 (6th Cir.1994).

It is clear that a majority of the Justices in *Bakke* expressly agreed that the California Supreme Court erred in enjoining the university from ever considering race in its admissions programs. Therefore, to the extent that the University Defendants assert *Bakke's* holding to be that " 'a

properly devised admissions program involving the competitive consideration of race ·and ethnic origin' " is constitutional, this Court agrees. *See Bakke,* 438 U.S. at 320, 98 S.Ct. at 2763; *see also Minnick v. California Dep't of Corr.,* 452 U.S. 105, 115 & n. 17, 101 S.Ct. 2211, 2217 & n. 17, 68 L.Ed.2d 706 (1981) (recognizing that the opinions of Justices Brennan, White, Marshall, Blackmun, and Powell "unequivocally stated that race may be used as a factor in the admissions process in some circumstances"); *Oliver v. Kalamazoo Bd. of Educ.,* 706 F.2d 757, 763 (6th Cir.1983) (citing *Bakke* for proposition that "affirmative action admission programs of educational institutions may take race into account"). What is less clear, however, is whether five Justices implicitly agreed that diversity can be a compelling interest in the context of higher education, *i.e.,* whether universities have a compelling interest in the educational benefits that flow from a racially and ethnically diverse student body.

It is clear that no five Justices in *Bakke* expressly held that diversity was a compelling interest under the Equal Protection Clause. The most that can be garnered from *Bakke's* splintered decision is that five Justices reached the same conclusion, *i.e.* that universities may take race into account in admissions when done so properly, for separate, unrelated reasons.

The University Defendants, relying upon *Smith v. University of Washington,* 233 ·F.3d 1188 (9th Cir.2000), contend that Justice Powell's opinion is the "narrowest opinion" of the Court and therefore, diversity is a compelling governmental interest as a matter of law.[8]

---

**7.** Defendant–Intervenors join in the University Defendants' assertion that racial diversity is a compelling governmental interest in the context of higher education. (Def.-Intervenors' 8/11/00 Resp. to Defs.' Mot. at 3–5).

**8.** In their briefs, the University Defendants rely on the district court's opinion in *Smith,* No. C97–3352 (W.D.Wash. Feb. 12, 1999). On December 4, 2000, however, the Ninth Circuit affirmed the district court's decision.

While this Court does not necessarily agree with the Ninth Circuit's conclusion that Justice Powell's "analysis is the narrowest footing upon which a race-conscious decision making process could stand," *Smith*, 233 F.3d at 1199, this Court reaches the same ultimate conclusion as the Ninth Circuit, *i.e.*, that under *Bakke*, diversity constitutes a compelling governmental interest in the context of higher education justifying the use of race as one factor in the admissions process, albeit through somewhat different reasoning.[9]

Plaintiffs, relying on the Fifth Circuit's decision in *Hopwood v. State of Texas*, 78 F.3d 932 (5th Cir.1996), *cert. denied*, 518 U.S. 1033, 116 S.Ct. 2581, 135 L.Ed.2d 1094 (1996), and more recently, the United States District Court for the Southern District of Georgia's decision in *Johnson v. Board of Regents of University System of Georgia*, 106 F.Supp.2d 1362, 1375 (S.D.Ga.2000), contend that, as a matter of law, "diversity" and "academic freedom" are not compelling governmental interests that can ever justify the use of race in the admission process. This Court disagrees.

In *Hopwood*, two of the three judges on the Fifth Circuit panel held "that any consideration of race or ethnicity... for the purpose of achieving a diverse student body is not a compelling interest under the Fourteenth Amendment." *Hopwood*, 78 F.3d at 944. The Fifth Circuit reasoned that by explicitly agreeing with a portion of Justice Powell's opinion, but remaining silent in regard to Justice Powell's diversity rationale, the Justices who joined Justice Brennan's opinion in *Bakke* "implicitly rejected" Justice Powell's position regarding diversity. *Id.* This Court, however, believes that the panel in *Hopwood* reads too much into the other Justices' silence regarding Justice Powell's diversity rationale. It is just as likely that the other Justices felt no need to address the issue of diversity based upon their finding that under intermediate scrutiny, the program at issue was justified as a means to remedy past discrimination.

For example, Justice Brennan's silence regarding diversity could just as easily be interpreted as "implicit approval" that, in an appropriate case, diversity may constitute a compelling governmental interest. In fact, in *Metro Broadcasting, Inc. v. F.C.C.*, 497 U.S. 547, 568, 110 S.Ct. 2997, 3010, 111 L.Ed.2d 445 (1990), *rev'd on other grounds, Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), Justice Brennan specifically described the Supreme Court's decision in *Bakke* as recognizing that "a 'diverse student body' contributing to a 'robust exchange of ideas' is a 'constitutionally permissible goal' on which a race-conscious university admissions program may be predicated." In this Court's opinion, Justice Brennan's statement in *Metro Broadcasting* further supports a conclusion that his silence regarding the diversity interest in *Bakke* was not an implicit rejection of such an interest, but rather, an implicit approval of such an interest. As the Ninth Circuit recognized in *Smith*:

> True it is that Justice Brennan did not specifically say that "race" could be used to achieve student body diversity in the absence of any societal discrimination, but, then, there was no need for him to do so in light of his view about past societal discrimination. Yet, we can hardly doubt that he would have embraced that somewhat narrower principle if need be, for he thought that it was simply an allotrope of the principle he was propounding.

*Smith*, 233 F.3d at 1200.

Although this Court agrees that since *Bakke*, no Supreme Court decision has explicitly accepted the diversity rationale under strict scrutiny, this Court does not

---

9. Recognizing that neither the Supreme Court nor the Sixth Circuit have definitively held that diversity can never be a compelling interest under strict scrutiny, this Court is satisfied that the University's argument remains viable.

agree that under recent Supreme Court precedent, the diversity interest can never constitute a compelling state interest, especially in the context of higher education. In fact, none of the cases relied upon by the Fifth Circuit involved the issue of whether the educational benefits that flow from a racially and ethnically diverse student body can ever constitute a compelling governmental interest in the context of higher education, most likely because the Supreme Court has not been faced with this precise issue since *Bakke.* *See Hopwood,* 78 F.3d at 944–45; *Johnson,* 106 F.Supp.2d at 1367–70.

In *Hopwood,* the Fifth Circuit relied upon the Supreme Court's decision in *City of Richmond v. J.A. Croson,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), in reaching its conclusion that diversity can never justify the use of racial classifications. *Croson,* however, involved a minority set-aside program in the context of government construction contracts. This Court agrees with Judge Wiener's concurring opinion in *Hopwood* that the public graduate or professional school context is distinguishable from the employment, minority business set-aside, and re-districting contexts in that, unlike the other cited contexts, the higher education context implicates "the uneasy marriage of the First and Fourteenth Amendments." [10] *Hopwood,* 78 F.3d at 965 n. 21 (Wiener, J., concurring).

As Justice Powell recognized in *Bakke,* "[a]cademic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Bakke,* 438 U.S. at 312, 98 S.Ct. at 2759. This "freedom" has always been viewed as including "[t]he freedom of the university to make its own judgments as to education," including "the selection of its student body." *Id.* (citing *Sweezy v. New Hampshire,* 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring); *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967)).

Moreover, that section of Justice O'Connor's opinion in *Croson* that is most often cited for the proposition that race-based classifications must be "strictly reserved for remedial settings" did not enjoy a majority of the Court. *Croson,* 488 U.S. at 493, 109 S.Ct. at 722. In his concurring opinion, Justice Stevens specifically disagreed with the premise that seemed to underlie Justice O'Connor's opinion, *i.e.,* "that a governmental decision that rests on a racial classification is never permissible except as a remedy for a past wrong." *Id.* at 511, 109 S.Ct. at 731. In Justice Stevens's opinion, Justice O'Connor's approach "overlook[ed] the potential value of race-based determinations that may serve other valid purposes." *Id.* at 511 n. 1, 109 S.Ct. at 731 n. 1.

In short, this Court is not convinced that recent Supreme Court precedent has established, as a matter of law, that the consideration of race in an attempt to attain the educational benefits that flow from a racially and ethnically diverse student body in the context of higher education can never constitute a compelling interest under strict scrutiny. To that end, this Court agrees with Judge Wiener's concurring opinion in *Hopwood* that applicable Supreme Court precedent has never held

**10.** As the First Circuit recognized in *Wessmann v. Gittens,* 160 F.3d 790, 795–96 (1st Cir.1998):

> In the education context, *Hopwood* is the only appellate court to have rejected diversity as a compelling interest, and it did so only in the face of vigorous dissent from a substantial minority of the active judges in the Fifth Circuit. *See Hopwood v. State of Texas,* 84 F.3d 720, 721 (5th Cir.1996)

(Politz, C.J., with whom King, Wiener, Benavides, Stewart, Parker, and Dennis, JJ., joined, dissenting from denial of rehearing en banc). The question that divided the Fifth Circuit centered on the precedential value of Justice Powell's controlling opinion in *Bakke.* The panel in *Hopwood* pronounced that opinion dead. The dissenting judges countered that the reports of *Bakke*'s demise were premature.

"squarely and unequivocally either that remedying the effects of past discrimination is the only compelling state interest that can ever justify racial classification, or conversely that achieving diversity in the student body of a public graduate or professional school can never be a compelling governmental interest." *Hopwood,* 78 F.3d at 964 (Wiener, J., concurring); *see also Smith,* 233 F.3d at 1200 ("For now, therefore, it ineluctably follows that the Fourteenth Amendment permits University admissions programs which consider race for other than remedial purposes, and educational diversity is a compelling governmental interest that meets the demands of strict scrutiny of race-conscious measures."); *Eisenberg v. Montgomery County Pub. Schs.,* 197 F.3d 123, 130 (4th Cir.1999) (noting that issue of whether diversity constitutes a compelling interest remains unresolved); *Boston's Children First v. City of Boston,* 62 F.Supp.2d 247, 258 (D.Mass.1999) (rejecting plaintiff's contention on motion for preliminary injunction that diversity can never be compelling governmental interest); *Hunter v. Regents of Univ. of Cal.,* 971 F.Supp. 1316, 1324–27 (C.D.Cal.1997) (rejecting plaintiff's contention that remedying past discrimination is only compelling state interest). Accordingly, this Court is satisfied that, if presented with sufficient evidence regarding the educational benefits that flow from a diverse student body, there is nothing barring the Court from determining that such benefits are compelling under strict scrutiny analysis.

11. The Association of American Laws Schools, National Association of State Universities and Land Grant Colleges, Committee on Institutional Cooperation (an academic consortium including Indiana University, Michigan State University, Northwestern University, The Ohio State University, Pennsylvania State University, Purdue University, the University of Chicago, the University of Illinois, the University of Iowa, the University of Michigan, the University of Minnesota, and the University of Wisconsin–Madison), and

■ The University Defendants have presented this Court with solid evidence regarding the educational benefits that flow from a racially and ethnically diverse student body. According to Patricia Y. Gurin, Professor of Psychology at the University of Michigan and Interim Dean of the LSA, "[s]tudents learn better in a diverse educational environment, and they are better prepared to become active participants in our pluralistic, democratic society once they leave such a setting." (Gurin Rep. at 3; *see also* U.S. Br. at 20–24; Association of American Law Schools ("ALS")[11] Br. at 6–10). Diversity in higher education also serves to break "patterns of racial segregation and separation historically rooted in our national life." (*Id.*).

Gurin reports that "multi-institutional national data, the results of an extensive survey of students at the University of Michigan, and data drawn from a specific classroom program at the University of Michigan" show that "[s]tudents who experienced the most racial and ethnic diversity in classroom settings and in informal interactions with peers showed the greatest engagement in active thinking processes, growth in intellectual engagement and motivation, and growth in intellectual and academic skills." (*Id.* at 5). Such students were also "better able to understand and consider multiple perspectives, deal with the conflicts that different perspectives sometimes create, and appreciate the common values and integrative forces that harness differences in pursuit of common ground." (*Id.* at 5–6; *see also* ALS Br. at 11–13; American Council on Education ("ACE")[12] Br. at 9–11).

Wayne State University have joined in one amicus brief in support of the University, together representing over 360 institutional members of the professional higher education community.

12. The American Council on Education is joined by twenty-four other associations, councils, and other groups representing the higher education community throughout the United States.

Members of heterogeneous working groups also offer more creative solutions to problems than do homogeneous groups, and show a greater potential for critical thinking because heterogeneity "eliminates a problem termed 'group think,' an organizational situation in which group members mindlessly conform." (*Id.* at 17) (internal citation omitted). Students who had experienced the most diversity in classroom settings and in informal interactions with peers showed the greatest engagement in active thinking processes, growth in intellectual engagement and motivation, and growth in intellectual and academic skills. (*Id.* at 35–36 & Tables C1, C2, M1, M2, I1). Gurin also concludes that on average, students who attend more diverse institutions exhibit a greater "intellectual engagement and motivation index" and a greater "citizenship engagement index." (*Id.*, Figs. 3 & 4).

A number of amici have filed briefs concurring with the University that diversity results in a richer educational experience for students.[13] In support of its position, the United States cites a study by Alexander Astin, Director of the Higher Education Research Institute at the University of California, in which Astin associates diversity with increased satisfaction in most areas of the college experience and an increased commitment to promoting racial understanding and participation in cultural activities, leadership, and citizenship. (U.S. Br. at 20–21; *see also* ALS Br. at 6; ACE Br. at 15).

The over 360 institutions represented by the Association of American Law Schools assert that they have learned through their extensive experience in the educational realm that the quality of education for all students is greatly enhanced when student bodies include persons of diverse backgrounds, interests, and experiences, including racial and ethnic makeups. (ALS Br. at v). According to these institutions, a decision adverse to the University Defendants would significantly undermine their ability to provide the highest quality of academic experience and to prepare their students to effectively contribute to society after graduation. (*Id.* at vi).

Plaintiffs have presented no argument or evidence rebutting the University Defendants' assertion that a racially and ethnically diverse student body gives rise to educational benefits for both minority and non-minority students. In fact, during oral argument, counsel for Plaintiffs indicated his willingness to assume, for purposes of these motions, that diversity in institutions of higher education is "good, important, and valuable." Counsel for Plaintiffs, however, contends that "good, important, and valuable" is not enough, and that the diversity rationale is too amorphous and ill-defined, and "too limitless, timeless, and scopeless," to rise to the level of a compelling interest. According to counsel for Plaintiffs, the University's diversity rationale has "no logical stopping point" but rather is a "permanent regime" in direct conflict with the strict scrutiny standard.

This Court, however, is not convinced that what may be too amorphous and ill-defined in other contexts, *i.e.* the construction industry context, is also necessarily too amorphous or ill-defined in the context of higher education. In this Court's opinion, the fact that the University cannot articulate a set number or percentage of minority students that would constitute the requisite level of diversity does not, by itself, eliminate diversity as a potentially compelling interest.

Furthermore, unlike the remedial setting, diversity in higher education, by its

---

**13.** Along with the ALS and ACE, the following have filed amicus briefs in support of the University's position: the United States, the State of Ohio, the Michigan Attorney General, General Motors Corporation, Steelcase, Inc., joined by nineteen other global corporations, and the National Association of Social Workers, joined by the Council on Social Work Education, the Association of Baccalaureate Social Work Program Directors, Inc., and the Group for the Advancement of Doctoral Education in Social Work.

very nature, is a permanent and ongoing interest. As previously noted, diversity is not a "remedy." Therefore, unlike the remedial setting, where the need for remedial action terminates once the effects of past discrimination have been eradicated, the need for diversity lives on perpetually. This does not mean, however, that Universities are unrestrained in their use of race in the admissions process, as any use of race must be narrowly tailored. Hopefully, there may come a day when universities are able to achieve the desired diversity without resort to racial preferences. Such an occurrence, however, would have no affect on the compelling nature of the diversity interest. Rather, such an occurrence would affect only the issue of whether a university's race-conscious admissions program remained narrowly tailored. In this Court's opinion, the permanency of such an interest does not remove it from the realm of "compelling interests," but rather, only emphasizes the importance of ensuring that any race-conscious admissions policy that is justified as a means to achieve diversity is narrowly tailored to such interest.

The only argument rebutting the University Defendants' assertions regarding the educational benefits of a diverse student body comes from the National Association of Scholars ("NAS"), which has filed a brief as amicus curiae in support of Plaintiffs. Contrary to the amici in support of the University Defendants, the NAS contends that "*intellectual* diversity bears no obvious or necessary relationship to *racial* diversity." (NAS Br. at 3). NAS specifically takes issue with the studies relied upon by the ALS, contending that such studies really report that "outcomes are generally not affected" by racial diversity on campus. (*Id.* at 6–7).

NAS also asserts that none of the variables Gurin uses in her studies as proxies for racial diversity on college campuses actually requires the presence of other-race students on campus. (*Id.* at 8). For example, NAS asserts that Gurin relies on a student's attendance at an ethnic studies course coupled with either participation in a racial/cultural awareness workshop or a discussion regarding racial issues. (*Id.*). As NAS points out, neither of these necessarily requires the presence of other-race students.

NAS also attacks Gurin's study as providing no indication of the number of minority students that are needed to achieve the effects reported. (*Id.* at 9). According to NAS, "[i]t is possible that the positive outcomes that Gurin catalogues do not require any more racial diversity than that which would occur without racial preferences." (*Id.*). This argument, however, does not go to the core issue of whether the educational benefits that flow from a diverse student body constitute a compelling governmental interest, but rather, whether the means employed to achieve that interest are narrowly tailored.

This Court is persuaded, based upon the record before it, that a racially and ethnically diverse student body produces significant educational benefits such that diversity, in the context of higher education, constitutes a compelling governmental interest under strict scrutiny.

### 3. Narrowly Tailored Analysis

Having determined that the educational benefits flowing from a racially and ethnically diverse student body are a sufficiently compelling interest to survive strict scrutiny, the Court must now determine whether the LSA's admissions policies for the years at issue (1995–present) were narrowly tailored to achieving that interest.

Although Justice Powell found diversity to be a compelling interest in the context of a university's admissions program, Justice Powell ultimately found that the particular admissions program at issue in *Bakke* was not a narrowly tailored means of achieving such interest and accordingly, the program was nonetheless unconstitutional. According to Justice Powell, the

fatal flaw in the University of California's program was that:

> It tells applicants who are not Negro, Asian, or Chicano that they are totally excluded from a specific percentage of the seats in an entering class. No matter how strong their qualifications, quantitative and extracurricular, including their own potential for contribution to educational diversity, they are never afforded the chance to compete with applicants from the preferred groups for the special admissions seats. At the same time, the preferred applicants have the opportunity to compete for every seat in the class.

*Bakke*, 438 U.S. at 318, 98 S.Ct. at 2763. However, "[i]n enjoining [the university] from ever considering the race of any applicant," the California Supreme Court had "failed to recognize that the State has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin." *Id.* For that reason, Justice Powell concluded that so much of the California court's judgment that enjoined the university from *any* consideration of an applicant's race had to be reversed.[14]

In contrast to the University of California's special admissions system, Justice Powell cited Harvard's admissions program as an example of how race could properly be taken into account in an effort to achieve diversity. *Id.* at 316, 98 S.Ct. at 2762. As Justice Powell described Harvard's admissions program:

> In such an admissions program, race or ethnic background may be deemed a "plus" in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats. The file of a particular black applicant may be examined

for his potential contribution to diversity without the factor of race being decisive when compared, for example, with that of an applicant identified as an Italian-American if the latter is thought to exhibit qualities more likely to promote beneficial educational pluralism. Such qualities could include exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, a history of overcoming disadvantage, ability to communicate with the poor, or other qualifications deemed important. In short, an admissions program operated in this way is flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight. Indeed, the weight attributed to a particular quality may vary from year to year depending upon the "mix" both of the student body and the applicants for the incoming class.

*Id.* at 317–18, 98 S.Ct. at 2762.

According to Justice Powell, such a program was appropriate because it "treat[ed] each applicant as an individual in the admissions process." *Id.* at 318, 98 S.Ct. at 2762. "The applicant who loses out on the last available seat to another candidate receiving a 'plus' on the basis of ethnic background will not have been foreclosed from all consideration for that seat simply because he was not the right color or had the wrong surname. It would mean only that his combined qualifications, which may have included similar nonobjective factors, did not outweigh those of the other applicant." *Id.* An applicant whose qualifications had been weighed "fairly and competitively" had no basis to complain of

---

**14.** In contrast, Justice Brennan found that there was "no sensible, and certainly no constitutional, distinction between, for example, adding a set number of points to the admissions rating of disadvantaged minority applicants as an expression of the preference with

the expectation that this will result in the admission of an approximately determined number of qualified minority applicants and setting a fixed number of places for such applicants." *Bakke*, 438 U.S. at 378, 98 S.Ct. at 2793.

unequal treatment under the Fourteenth Amendment. *Id.*

Although the Harvard plan spoken of approvingly by Justice Powell did not set target-quotas for the number of minorities to be admitted in a given year, the plan clearly used race as a factor in admissions. *Id.* at 316, 98 S.Ct. at 2761–62. Therefore, to the extent that Plaintiffs contend that race can never be used as a factor during admissions decisions, their argument must be rejected.

It is also clear that under the Harvard plan, "race may tip the balance in [an applicant's] favor just as geographic origin or a life spent on a farm may tip the balance in other candidates' cases." *Id.* at 316, 98 S.Ct. at 2761. Therefore, in some cases, an applicant may constitutionally be granted admission over another applicant solely on account of his race.

Furthermore, a university may "pay[ ] some attention to distribution among many types and categories of students," as more than a "token number of blacks" is necessary to fully achieve the educational benefits that flow from a racially and ethnically diverse student body. *Id.* at 316–17, 98 S.Ct. at 2762. As Harvard explained in regard to its admission program:

> In Harvard College admissions the Committee has not set target-quotas for the number of blacks, or of musicians, football players, physicists or Californians to be admitted in a given year. At the same time the Committee is aware that if Harvard College is to provide a truly heterogen[e]ous environment that reflects the rich diversity of the United States, it cannot be provided without some attention to numbers. It would not make sense, for example, to have 10 or 20 students out of 1,100 whose homes are west of the Mississippi. Comparably, 10 or 20 black students could not begin to bring to their classmates and to each other the variety of points of view,

backgrounds and experiences of blacks in the United States.

*Id.* at 323, 98 S.Ct. at 2765.

As is clear from Justice Powell's opinion in *Bakke,* a university's interest in achieving the educational benefits that flow from a diverse student body does not justify an admissions program designed to admit a predetermined number or proportion of minority students. Instead, a university must carefully design its system to fall between these two competing ends of the spectrum, *i.e.,* between a system that completely fails to achieve a meaningful degree of diversity, under which the benefits associated with a diverse student body will never be realized, and a rigid quota system, which is clearly unconstitutional under Justice Powell's opinion in *Bakke.*

In striving to achieve such a system, "race or ethnic background may be deemed a 'plus' in a particular applicant's file," as long as this plus "does not insulate the individual from comparison with all other candidates for the available seats." *Id.* at 317, 98 S.Ct. at 2762. As Justice Powell explained with reference to the Harvard plan, an admissions program that takes race into consideration must be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight." *Id.* at 317, 98 S.Ct. at 2761. It is exactly because race need not necessarily be accorded the same weight as other objective factors that, in some instances, "race may tip the balance in an applicant's favor." *Id.* at 316, 98 S.Ct. at 2761.

The instant action involves the LSA's admissions programs from 1995 through the present. In 1995 and 1996, admission decisions were based primarily on a set of guideline tables referred to as grids, with GPA 2 ranges represented on the vertical axis, and ACT/SAT scores represented on the horizontal axis.[15] In 1995, four grids

---

**15.** An applicant's GPA 2 was calculated by

adjusting the applicant's high school GPA

were used: (1) in-state non-minority applicants, (2) out-of-state non-minority applicants, (3) in-state minority applicants, and (4) out-of-state minority applicants. In 1996 only two grids were used(1) in-state and legacy applicants and (2) out-of-state applicants—with non-minority applicant action codes listed in the top row of the grid's cells, and minority action codes listed in the bottom row. In 1997, the same grids as in 1996 were used. However, in 1997, the LSA also added .5 to under-represented minority applicants' GPA 2 scores.

From 1998 through the present, the LSA has used a 150 point system, under which admission decisions were generally determined by the applicant's rank on the 150 point scale. Under-represented minority applicants automatically receive 20 points based upon their membership in one of the identified under-represented minority categories. In 1999 and 2000, the LSA also added a system whereby certain applicants, including under-represented minority applicants, could be "flagged," thereby keeping such applicants in the review pool for further consideration.

Beyond the fact that rigid quotas are impermissible, Justice Powell's opinion in *Bakke* fails to set forth any bright line regarding what constitutes a permissible consideration of race in admissions decisions. Furthermore, in situations such as this, it is often a thin line that divides the permissible from the impermissible. Applying the principles set forth by Justice Powell in *Bakke*, this Court is satisfied

that when examined in its entirety, the LSA's current admissions program (1999–present) represents a permissible use of race. At the same time, however, the Court is satisfied that although the LSA views its current system as "chang[ing] only the mechanics, not the substance" of its prior systems, its prior systems, when examined in their entirety, cross that thin line from the permissible to the impermissible.[16]

## A. The LSA's Current System (1999–Present)

Foremost in the Court's decision that the LSA's current admissions program is constitutional is the fact that the LSA's current program does not utilize rigid quotas or seek to admit a predetermined number of minority students. Therefore, the LSA's current program does not contain the fatal flaw identified by Justice Powell in *Bakke*. Instead, race is taken into account in two ways under the LSA's current program. First, admissions counselors may assign each under-represented minority applicant twenty points in calculating their selection index score on account of their race. Second, under the LSA's current program, counselors may "flag" applicants that possess certain qualities or characteristics the LSA deems important to the composition of its freshman class, one of which is "under-represented race," thereby keeping an applicant who may not necessarily pass the LSA's initial admit threshold in the review pool for further consideration.[17] Such uses of race, howev-

based upon several factors, including the quality of the applicant's high school, the strength of the applicant's high school curriculum, any unusual circumstances, the applicant's geographical residence, and the applicant's alumni relations, if any.

**16.** It is understandable that the LSA does not contend that there is any "substantive" difference between its current and prior admissions programs. To acknowledge a substantive difference in such programs would give some support to Plaintiffs' claims that the admissions programs in effect from 1995 through 1998 were not "narrowly tailored." Further-

more, the University Defendants' contention that "only the current system can form the basis for [injunctive relief]," and their arguments in support of this contention, (Defs.' 8/11/00 Br. at 92), suggest that there are some significant differences between the LSA's current admissions programs and those used from 1995 through 1998.

**17.** Other qualities or characteristics include high school class rank, unique life experiences, challenges, circumstances, interests or talents, socioeconomic disadvantage, and geography.

er, operate as nothing more than the "plus" spoken of with approval by Justice Powell in *Bakke.*

In response, Plaintiffs contend that the LSA's practice of adding twenty points to under-represented minority applicants' selection index scores really operates as the functional equivalent of a quota. Justice Powell, however, rejected essentially the same argument in *Bakke* explaining:

> It has been suggested that an admissions program which considers race only as one factor is simply a subtle and more sophisticated—but no less effective—means of according racial preference than the Davis program. A facial intent to discriminate, however, is evident in petitioner's preference program and not denied in this case. No such facial infirmity exists in an admissions program where race or ethnic background is simply one element—to be weighed fairly against other elements—in the selection process. "A boundary line," as Mr. Justice Frankfurter remarked in another connection, "is none the worse for being narrow." *McLeod v. J. E. Dilworth Co.,* 322 U.S. 327, 329, 64 S.Ct. 1023, 1025, 88 L.Ed. 1304 (1944). And a court would not assume that a university, professing to employ a facially nondiscriminatory admissions policy, would operate it as a cover for the functional equivalent of a quota system. In short, good faith would be presumed in the absence of a showing to the contrary in the manner permitted by our cases. *See e.g., Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

*Id.* at 318–19, 98 S.Ct. at 2762–63.

Minority applicants are not insulated from review by virtue of these twenty points any more than other applicants are insulated from review by virtue of the six points awarded for geographic factors, four points awarded for alumni relationship, three points awarded for an outstanding essay, five points awarded for leadership and service skills, twenty points awarded for socioeconomic status, or twenty points awarded for athletes. In fact, the Court notes that in certain circumstances, these points may be combined for a total of up to forty. The fact that these points may "tip the balance" in favor of a particular applicant, however, does not necessarily lead to a conclusion that such applicants have been insulated from competition in the sense that Justice Powell spoke of in *Bakke.*

The Court agrees that in certain situations, a pre-existing commitment to a fixed preference may translate into an exact proportion of the favored group being selected. This is most clearly illustrated by programs in which a preference is only available for one factor, for example race. However, under the LSA's admissions program, there are many factors that may entitle an applicant to a preference, thereby making the results of any one factor less predictable.

Plaintiffs also contend that the LSA's program, under which twenty points may be added to the selection index score of under-represented minority applicants, operates as the same type of "dual" or "two-track" system prohibited by Justice Powell in *Bakke.* (Pls.' 8/11/00 Br. at 15). The "two-track" system Justice Powell spoke of in *Bakke,* however, was not a two-track system that employed lower thresholds for minority applicants *vis a vis* majority applicants. Such a conclusion is evident from the fact that not once in his narrowly tailored analysis did Justice Powell ever discuss the fact that under the University of California's admissions program, majority students were subject to a 2.5 minimum GPA requirement, whereas there was no minimum GPA requirement for minority students. *See id.* at 274–75, 98 S.Ct. at 2739–40.

Instead, the "two-track" system of which Justice Powell spoke was the university's system under which one group of students, *i.e.* minority students, competed for one set of seats, and another group of students, *i.e.* majority students, competed for another set of seats, thereby in effect creating two separate admissions systems. Justice Powell's statement that the university's interest in genuine diversity would not be served by "expanding [the university's] two-track system into a multitrack program with a prescribed number of seats set aside for each identifiable category of applicants" further confirms that the two-track system Justice Powell spoke of related to the university's practice of setting seats aside for minority applicants, not the university's practice of employing different GPA requirements for minority *vis a vis* majority applicants. *Id.* at 314, 98 S.Ct. at 2761.

Furthermore, unlike the University of California, the LSA does not utilize a separate admissions review committee for under-represented minority applications. Instead, admission counselors are assigned to specific geographic areas. Each counselor reviews all applications from his or her territory, under-represented minority and non-minority alike. There is no separate review or assignment of under-represented minority applicants as there was in *Bakke.* (Spencer Dep. at 273; Gauss Dep. at 31, Vanhecke Dep. at 99).

Moreover, whenever a point-based system such as the LSA's is used in making admissions decisions, any factor that may result in points being added to an applicant's total score will necessarily have the effect of lowering that applicant's admission threshold. For example, any time an applicant receives three points for an outstanding essay, it can just as easily be said that the threshold for admission for that applicant has now been reduced by three points. The same is true for each of the other factors used during the admissions process, *e.g.*, geographic location, alumni relationship, socioeconomic status, etc.

Such a result is the natural byproduct of using such a point system.

What Plaintiffs really appear to contest is the fact that race is accorded twenty points, while other factors that may more consistently favor non-minority students are not typically accorded the same weight. However, as Justice Powell recognized in *Bakke,* universities may accord an applicant's race some weight in the admissions process and, in doing so, universities are not required to accord the same weight to race as they do other factors. *Bakke,* 438 U.S. at 317–18, 98 S.Ct. at 2762. As long as the admissions program does not work to isolate the applicants from review, it withstands constitutional muster, despite the fact that it may provide individuals with a "plus" on account of their race.

■ Plaintiffs also attack the LSA's "flagging" system. According to Plaintiffs, the files of under-represented minorities remain "protected" insofar as the LSA's flagging procedure ensures that the files of such students remain in the "review pool" because of their race.

Under the LSA's current admissions system, a counselor *may* "flag" an applicant if (1) in the counselor's estimation, the applicant is academically prepared for the University, (2) has a selection index score of at least 80 for residents, or 75 for non-residents, and (3) possesses a quality or characteristic the LSA deems important to the composition of its incoming class, including under-represented minority status. Counselors, however, are not *required* to flag every under-represented minority applicant. Furthermore, applicants other than under-represented minority applicants may also be flagged. For example, other factors a counselor may consider in flagging applications include whether the applicant was in the top of his class, resided in a preferred county of Michigan, exhibited any "unique life experiences, challenges, circumstances, interests or talents," exhibited a disadvantaged background, had an important connection

to the University community, or was a recruited athlete. (Defs.' Exs., Ex. Z at 3–4). Given that any number of applicants, including applicants other than under-represented minority applicants, may be "flagged" under the LSA's current system, the Court rejects Plaintiffs' contention that under-represented minorities remain "protected" by virtue of such system.

Plaintiffs also contend that the University Defendants have failed to sustain their burden of showing that it considered race-neutral alternatives to its current program. For example, according to Plaintiffs, one obvious race-neutral mechanism would be to randomly select all or a portion of the class from the entire pool of 'qualified' applicants, regardless of race. Plaintiffs, however, fail to explain how randomly selecting all or a portion of the class from the entire pool of applicants would produce a sufficiently diverse student body. As discussed *supra*, to achieve the educational benefits associated with a racially and ethnically diverse student body, more than a token number of under-represented minority students is required. Given the small size of the applicant pool, it is highly unlikely that a random selection process would result in a sufficiently diverse student body.

Furthermore, the University Defendants have presented evidence that a race-neutral admission program would substantially reduce the number of under-represented minority students in the LSA's incoming student body. (*See* Raudenbush 2/24/00 Supp. Rep. at 4–5; Raudenbush 3/3/99 Supp. Rep. at 9–11). If race were not taken into account, the probability of acceptance for minority applicants would be cut dramatically, while non-minority students would see only a very small positive effect on their probability of admission, due largely in part to the size of their respective applicant pools. (*See* Raudenbush 3/3/00 Supp. Rep. at 11).

The University Defendants have also presented evidence that a system that relied entirely on test scores would also lead to the rejection of a number of qualified minority applicants. (Bowen Rep. at 10). This is due to the fact that nationally, minorities are very under-represented at the higher level of standardized test scores, and over-represented at the lower level. (*Id.* at 10).

The University Defendants have also presented the expert opinion of William G. Bowen that the race-neutral admissions program currently used by the University of Texas, under which all students who finish in the top ten percent of their high school class are guaranteed admission, and any system based purely on an applicant's income level, would not be as effective in enrolling "an academically well prepared and diverse student body." (Bowen Rep. at 12). According to Bowen, the Texas approach would have the effect of "admit[ting] some students from weaker high schools while turning down better-prepared applicants who happen not to finish in the top tenth of their class in academically stronger schools." (*Id.*). Bowen further hypothesizes that "[s]o long as high schools differ so substantially in the academic abilities of their students and the level of difficulty of their courses, treating all applicants alike if they finished above a given high school class rank provides a spurious form of equality that is likely to damage the academic profile of the overall class of students admitted to selective institutions." (*Id.*).

According to Bowen, income-based strategies are just as ineffective as there "are simply too few blacks and Latinos from poor families who have strong enough academic records to qualify for admission to highly selective institutions." (*Id.* at 13). Bowen also reports that if universities were totally eliminated from considering race during the admissions process, "over half of the black students in selective colleges today would have been rejected." (*Id.*).

Furthermore, the University has attempted to enlarge its pool of under-repre-

sented minority applicants through vigorous minority recruitment programs, which have all proved to be unavailing. For example, the University's efforts have included personal contact with minority students at symposia, attendance at recruiting fairs, direct mailings, campus visits, and offices in Detroit. (Vanhecke Dep. at 11–12; Spencer Dep. at 29, 196–97). Nevertheless, according to the University, its pool of qualified minority applicants for the LSA has remained small, most of whom are also highly recruited by other selective institutions and universities. (Defs.' 7/17/00 Br. at 27).

The Court also rejects Plaintiffs' contention that the LSA's current system amounts to nothing more than racial balancing. Unlike the cases relied upon by Plaintiffs, the LSA does not seek to achieve a certain proportion of minority students, let alone a proportion that represents the community. To that end, the Court agrees with the Fourth Circuit in *Tuttle v. Arlington County Sch. Bd.*, 195 F.3d 698, 707 (4th Cir.1999), that an educational institution's goal of achieving the educational benefits associated with a diverse student body "do[es] not require racial balancing." However, the University's interest does require a sufficiently diverse student body and therefore, requires that some attention be given to the composition of the student body. Although fixed racial quotas and racial balancing are not necessary to achieving that goal, the consideration of an applicant's race during the admissions process necessarily is.

In summary, the Court is satisfied that the LSA's current admissions program, under which certain minority applicants receive a "plus" on account of their race but are not insulated from all competition with other applicants, meets the requirements set forth by Justice Powell in *Bakke* and is therefore constitutional. Accordingly, the University Defendants' motion for summary judgment shall be granted with respect to the LSA's current admissions program, and Plaintiffs' motion for injunctive relief shall be denied.

## B. The LSA's Prior Programs (1995–1998)

Although the Court finds the LSA's current admissions program to be permissible under the principles set forth by Justice Powell in *Bakke*, the Court is similarly satisfied that the LSA's prior admissions programs, when examined in their entirety, represent an impermissible use of race. One of the most significant factors that transforms the permissible into the impermissible in this case is the LSA's prior practice of "protecting" or "reserving" seats for under-represented minority applicants. As explained by the LSA itself:

Because the class is selected on a rolling basis, rather than at one point in time, a certain number of seats is designated during the admissions cycle for in-state students and for certain other groups of students, including, for example, athletes, foreign applicants, *underrepresented minority candidates,* and ROTC candidates (sometimes referred to as "protected" space). This space is "protected" to enable OUA to achieve the enrollment targets of the University and of the individual units while using a rolling admissions system. If this space is not filled by qualified candidates from the designated groups toward the end of the season, it used to admit students from the postponed pool or the extended waiting list, applicants to other units, etc.

(Defs.' Answer Interrog. No. 1) (emphasis added); (*See also* Pls.' 4/9/99 Exs., Vol. 1, Exs. P, Q, & R) (showing number of protected seats for particular academic years). The LSA has also explained this practice in the following manner:

LSA admissions occur on a "rolling" basis: rather than waiting for one date in late winter to notify all applicants of the disposition of their applications, LSA admits applicants throughout the admissions season. Under such a process,

offers of admissions must be carefully monitored and managed to ensure that sufficient spaces are reserved, or protected, for attractive applicants who apply later in the cycle. The number of protected spaces is determined by the expected pool size of various groups of applications. *As applicants from a particular group are admitted over the course of the admissions season, the protected spaces reserved for that group are used.* If the pool of qualified applicants never reaches the number of protected spaces, those slots are filled with qualified applicants off the wait list.

(Pls.' 4/9/99 Br. at 7 n. 4) (quoting Defendants' Motion for Reassignment or Designating Actions as Companion Cases in *Grutter v. Bollinger,* 97–CV–5928–DT).

Other memoranda refer to these "protected" seats as being "reserved" for particular groups of applicants. (*See* Pls.' 4/9/99 Exs., Vol. I, Ex. M). In fact, one memorandum specifically states that the number of "protected groups" for Fall 1997 would be decreased, thereby "opening up slots for non-protected applicants." (*Id.,* Ex. O). This evidence clearly indicates that these slots were not merely protected from the admissions process itself, but from competition by non-protected applicants. It is clear that the LSA's system operated as the functional equivalent of a quota and therefore, ran afoul of Justice Powell's opinion in *Bakke.*

In this Court's opinion, there is no significant difference between the LSA's prior practice of "protecting" or "reserving" seats and the University of California's quota system. The fact that non-minority applicants may have had a chance at any "leftover" spots at the end of the admissions cycle does not change this conclusion. Under both systems, preferred minority applicants were insulated from competition from non-preferred applicants for a given number of seats. The fact that this number may have changed from year to year, or even during any one particular admissions cycle, does not change this fact. It can hardly be said that those non-preferred applicants who, by pure chance, may have had an opportunity to compete for one of the leftover seats, were allowed to compete on equal footing for every seat in the class.

■ Furthermore, it is undisputed that from 1995 through 1997, the LSA used facially different grids and action codes based solely upon an applicant's race. Under these differing grids, a certain group of non-preferred applicants were automatically excluded from competing for a seat in the class without any type of individualized counselor review solely on account of their race,[18] whereas, preferred minority applicants were never automatically rejected, regardless of their grades and test scores. Rather, all minority applicants received some type of individualized counselor review. (McKinney Dep. at 41, Spencer Dep. at 105). This practice of "automatic exclusion" continued into the 1998 academic year despite the LSA's switch to the selection index system. (McKinney Dep. at 97–98, 150–52).

The Court agrees with the University Defendants' assertion that all who are ultimately admitted to the LSA are "qualified" academically, and neither Plaintiffs nor this Court seek to imply that those minorities who are admitted under the lower admissions standards are not academically qualified for admission. It cannot be seriously disputed, however, that the effect of the LSA's differing standards was to systematically exclude a certain group of non-minority applicants from participating in the admissions process based solely on account of their race.

For example, in 1995 and 1996, the LSA

---

18. The Court notes that the LSA's practice of automatically rejecting applicants also ended with the 1999 academic year.

used two grids for instate applicants,[19] one for "non-minority" applicants and another for "minority" applicants. The non-minority grid indicated that an applicant with a GPA 2 of 3.2–3.3 and ACT of 18–20/SAT of 400–500 would be automatically rejected, whereas a minority applicant with the same grade/score would have most likely been admitted.[20]

In so doing, the LSA's policies foreclosed each of the automatically rejected applicants from further consideration for a seat simply because they were not of a favored race or ethnicity. These applicants were never accorded any further individualized review as envisioned by Justice Powell in *Bakke*. In this Court's opinion, the LSA's different treatment of preferred minority applicants *vis a vis* non-preferred applicants at this stage of the admissions process further adds to the infirmity of the LSA's prior programs.

Moreover, the only distinguishing factor between the grids used by the LSA during these years was the applicant's race. Therefore, to the extent admissions counselors used such grids in making admissions decisions, it is clear from the face of the grids themselves that in some cases, the *only* defining factor was race.

Although the LSA's use of facially different grids/action codes based upon an applicants' race, in and of itself, may not have been constitutionally impermissible, when combined with the other components previously discussed by the Court, *i.e.* the LSA's use of protected seats and the LSA's system of automatic rejection, the Court is convinced that the LSA's prior programs, when examined in their entirety, fall within the impermissible under the principles enunciated by Justice Powell in *Bakke*. Accordingly, Plaintiffs' motion for summary judgment shall be granted with respect to the LSA's admissions programs employed from 1995 through 1998.

### *Qualified Immunity*

■ Defendants Bollinger and Duderstadt, who have been sued in their individual capacities under 42 U.S.C. § 1983, have moved for summary judgment on grounds of qualified immunity. Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "The question of whether qualified immunity attaches to an official's actions is a purely legal question for the trial judge to determine prior to trial." *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir.1988).

In order to determine whether an official is entitled to qualified immunity, a court must first consider, "whether, based on the applicable law, a constitutional violation occurred." *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir.1996) (citing *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 589 (6th Cir.1994)). As discussed *supra*, the Court is satisfied that although diversity is a sufficiently compelling interest to survive strict scrutiny, the LSA's prior admissions programs (1995–1998) were nonetheless impermissible under the principles enunciated by Justice Powell in *Bakke*. Therefore, the Court is satisfied that a constitutional violation has occurred.

Next, the Court must determine whether the constitutional violation involved " 'clearly established constitutional rights of which a reasonable person would have known.' " *Id.* at 1158 (quoting *Christophel v. Kukulinsky*, 61 F.3d 479, 485 (6th Cir. 1995)). "In determining whether a constitutional right is clearly established, a dis-

---

**19.** The Court notes that another set of grids was used for out-of-state applicants, for a total of four grids.

**20.** The minority grid also contained the option of delaying such a minority applicant "for senior year SAT's or ACT's."

trict court must find binding precedent by the Supreme Court, its court of appeals, or itself." *Sheets v. Moore,* 97 F.3d 164, 166 (6th Cir.1996) (citing *Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988)). Neither party disputes the fact that under the Fourteenth Amendment, every individual is entitled to equal protection of the laws. To date, however, there has been only one Supreme Court decision addressing the extent to which a university may take race into consideration during the admissions decision, *i.e.,* the Supreme Court's decision in *Bakke.* As is illustrated by the foregoing discussion, the binding effect of Justice Powell's opinion in *Bakke* has been the subject of much debate in recent years.

Furthermore, to defeat a claim of qualified immunity, Plaintiffs must show that Defendants "knew or reasonably should have known" that their actions were unconstitutional. *Harlow,* 457 U.S. at 816, 102 S.Ct. 2727; *see also Dickerson,* 101 F.3d at 1151 (quoting *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir. 1992)). " '[T]he unlawfulness must be apparent.' " *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)).

In finding the University of California's admission program unconstitutional, Justice Powell relied exclusively upon the fact that the university employed a rigid quota. In light of the principles enunciated by Justice Powell in *Bakke,* the Court does not believe that it would necessarily have been unreasonable for an official in Defendants' position to conclude that the LSA's admissions policies were constitutional. It is clear that the University did not employ the same type of rigid quota renounced by Justice Powell in *Bakke.* Moreover, the mere fact that this Court has disagreed with Defendants as to whether the LSA's programs were constitutional does not au-

tomatically defeat qualified immunity. As the Supreme Court has explained, "[t]he qualified immunity standard gives ample room for mistaken judgment by protecting all but the plainly incompetent or those who knowingly violate the law. This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued." *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991).

Applying the defense of qualified immunity in this case is, in this Court's opinion, consistent with the qualified immunity standard. Courts themselves have been struggling for well over two decades to fully understand what constitutes a properly devised admissions program under *Bakke.* This Court cannot say that a reasonable official in Defendants' position should have known that the LSA's prior admissions programs were unconstitutional. Accordingly, Defendants' motion for summary judgment based upon the doctrine of qualified immunity shall be granted.

### Eleventh Amendment Immunity

■ The Board of Regents ("the Board") also seeks summary judgment with respect to Plaintiffs' Title VI claims on grounds of Eleventh Amendment Immunity. In general, Eleventh Amendment immunity bars plaintiffs from bringing claims for damages against a state or its officials acting in their official capacities unless the state has waived its immunity, or Congress has exercised its power to override that immunity. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). With respect to Title VI, Congress has enacted a specific provision abrogating the states' Eleventh Amendment immunity. *See* 42 U.S.C. § 2000d–7(a)(1).[21]

21. 42 U.S.C. § 2000d–7(a)(1) specifically provides:

A State shall not be immune under the Eleventh Amendment of the Constitution of

the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C.A. § 794], title IX of the Education Amendments of 1972

In fact, the Board specifically recognizes that Congress has abrogated its Eleventh Amendment immunity with respect to claims under Title VI, and that by accepting federal funds, it has consented to being sued for damages in federal court. (Defs.' 5/3/99 Br. at 68). In support of its motion for summary judgment, however, the Board contends that the *scope* of that agreement does not encompass Plaintiffs' claims because the Board was not on "notice" that its conduct in this case would subject it to liability. (*Id.* at 68–69). According to the Board, its actions must violate "*clearly established* legal principles" for its Eleventh Amendment immunity to be abrogated. (*Id.*) (emphasis in original).

None of the cases relied upon by the Board, however, support its claim that its Eleventh Amendment immunity cannot be abrogated unless it had notice that its conduct was unconstitutional. In *Gebser v. Lago Vista Independent School District,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), the Supreme Court faced the issue of whether a plaintiff could maintain a cause of action for sexual harassment against a school under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, based upon a theory of *respondeat superior* or constructive notice. Because the express remedial scheme of Title IX was based upon notice to an appropriate person and an opportunity to rectify the discriminatory behavior, the Supreme Court held that a plaintiff could not maintain a cause of action under Title IX based upon a theory of *respondeat superior* or constructive notice. *Id.* 524 U.S. at 290–93, 118 S.Ct. at 1999–2000.

Similarly, in *Guardians Association v. Civil Service Commission of City of N.Y.,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), the Supreme Court faced the issue of whether a plaintiff could maintain a cause of action under Title VI without showing intentional discrimination on behalf of the defendant. In *Guardians,* the Supreme Court ultimately held that intent was not an essential element of a Title VI violation, but "a plaintiff should recover only injunctive, noncompensatory relief for a defendant's unintentional violations of Title VI." *Id.* at 607, 103 S.Ct. at 3235. Each of these cases addressed the requisite showing a plaintiff must make to sustain a claim under the respective federal statute, not whether a state's Eleventh Amendment immunity could be abrogated where the state has not been put on "notice" that the specific conduct alleged to be a violation of federal law was illegal.

The Supreme Court has referred to § 2000d as an "unequivocal waiver" of the states' Eleventh Amendment immunity. *See Lane v. Pena,* 518 U.S. 187, 198, 116 S.Ct. 2092, 2099, 135 L.Ed.2d 486 (1996). Furthermore, a number of courts have recognized that with respect to Title VI, Congress has validly abrogated the states' Eleventh Amendment immunity. *See, e.g., Fuller v. Rayburn,* 161 F.3d 516, 518 (8th Cir.1998) ("We nevertheless agree with Mr. Fuller that by enacting section 2000d–7, 'Congress abrogated the States' Eleventh Amendment immunity under … Title VI.'"); *DeKalb County Sch. Dist. v. Schrenko,* 109 F.3d 680, 688 (11th Cir. 1997) ("On the other hand, the parties agree that Congress has abolished the states' immunity for causes of action grounded in Title VI."); *United States v. Yonkers Bd. of Educ.,* 893 F.2d 498, 503 (2d Cir.1990) ("With respect to Title VI, which prohibits, inter alia, racial discrimination in federally assisted programs, Congress has expressly abrogated the states' Eleventh Amendment immunity …. ").

Moreover, to the extent that the Board seeks to extend the doctrine of qualified immunity to cover its actions, the Board's arguments must be rejected, as "[q]ualified

[20 U.S.C.A. § 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C.A. § 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.],

or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

immunity is not a defense available to governmental entities, but only to government employees sued in their individual capacity." *Johnson v. Outboard Marine Corp.,* 172 F.3d 531, 535 (8th Cir.1999); *see also Rodriguez v. City of New York,* 72 F.3d 1051, 1065 (2d Cir.1995) ("[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities."); *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1185 (11th Cir.1994) ("Governmental entities are not entitled to qualified immunity regarding section 1983 claims.").

By enacting § 2000d, Congress validly abrogated the states' Eleventh Amendment immunity with respect to Title VI claim. Therefore, although the Board remains free to assert that Plaintiffs have failed to set forth a proper case under Title VI, the Eleventh Amendment does not bar Plaintiffs' claims for damages. Accordingly, the Board's motion for summary judgment with respect to Plaintiffs' Title VI claim shall be denied.

### Conclusion

For the reasons stated above, Plaintiffs' motion for summary judgment is granted with respect to the LSA's admissions programs in existence from 1995 through 1998, and the admissions programs for such years are declared unconstitutional. However, the University Defendants' motion for summary judgment is granted with respect to the LSA's admissions programs for 1999 and 2000. Furthermore, Plaintiffs' request for injunctive relief is denied. Defendants Duderstadt and Bollinger's motion for summary judgment on grounds of qualified immunity is granted. The Board of Regent's motion for summary judgment on grounds of Eleventh Amendment immunity, however, is denied.

An Order consistent with this Opinion shall issue.